CHARLES N. SPRATT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 97917.   Promulgated January 31, 1941.

*Philip Neville, Esq.*, for the petitioner.
*L. W. Shaw, Esq.*, for the respondent.

504

## OPINION.

MELLOTT: The issues as set out at the beginning will be considered in the order stated.

### Issue No. 1.

Petitioner contends that the preferred shares or trust certificates of Building Number One Trust were legally and in effect a mortgage, and that, following well recognized principles, upon foreclosure (or in lieu thereof a deed from the mortgagor to the mortgagee) he is entitled to deduct the loss sustained ($10,757.17) in computing his net income for 1936; that Minnesota law clearly holds such a trust to be a mortgage; that the law as enunciated by the courts of Minnesota is controlling in this proceeding; and that the initial acquisition of the preferred shares can not be said to constitute a capital investment because all that petitioner did was to lend money and receive security therefor which he subsequently had to foreclose and ripen into title in himself.

Respondent contends that no loss whatsoever is allowable for the reason that at all times after 1927 petitioner was the owner of a beneficial interest in the trust property and no identifiable event

occurred with respect thereto in 1936 which could serve as the foundation for a loss; that the record fails to show the necessary facts with respect to computation of the alleged loss; that the proof with respect to value of the property conveyed to petitioner in 1936 was inadequate; and, in the alternative, if petitioner suffered any loss in 1936, it must be treated as a capital loss on the ground: (1) That the so-called trust was in reality an association to be treated under the revenue acts as a corporation and the property received by petitioner was a distribution in complete liquidation; or (2) the transaction whereby petitioner acquired the property in 1936 constituted a sale or exchange within the meaning of section 117 of the Revenue Act of 1936.

In support of his contention that the preferred shares or trust certificates were legally and in effect a mortgage, petitioner points to the definition of that term contained in *Buse* v. *Page*, 32 Minn. 111; 19 N. W. 736. In that case the Supreme Court of Minnesota defined a mortgage to be a "conveyance of real estate, or some interest therein, defeasible upon the payment of money or the performance of some other condition." The court also stated, however, that, in considering whether or not a transaction is a mortgage, the important question is, What was the intention of the parties?; and the intention is to be ascertained by looking at the written memorials of the transaction and its attendant facts and circumstances.

For the $40,500 which petitioner invested in Building Number One Trust, he received all of its preferred shares and 45 percent of its common shares. These shares were in the usual form of certificates of interest in a land trust. One of the certificates for preferred shares introduced in evidence is headed "Land Trust Certificate of Equitable Ownership in Real Estate—The Building Number One Trust." It certifies that the petitioner is the owner of preferred shares of beneficial interest of the par value of $100 each, transferable only on the books of the trustees upon surrender of the certificate properly endorsed. It also contains a statement to the effect that the preferences and rights of the various classes of shares are set forth in the trust agreement, the material portions of which are printed on the back of the certificate.

The trust agreement provided that the holders of the preferred shares should receive 7 percent cumulative annual dividends; that these dividends should be paid from net earnings after payment of expenses and principal and interest on the first mortgage; and that any net earnings remaining should be used to retire the preferred shares outstanding. The preferred shares contained no fixed obligation or agreement on the part of the trust to retire them or return to the owner or owners, at a specified time, his or their capital investment.

Petitioner devotes much argument on brief to the proposition that Federal courts are bound by state rules of law in determining whether

or not a trust is a mortgage and that in Minnesota a mortgage may be in the form of a trust deed. We do not question the soundness of this argument, but it seems to have no application here. Before the rule petitioner seeks to apply can be applicable, the intention to create a mortgage must be proved by clear and convincing evidence. *Bernard Long*, 1 B. T. A. 792, 794; *Federal Land Bank of St. Paul* v. *Smaagaard*, 192 Minn. 21; 256 N. W. 102. The evidence introduced by petitioner fails to disclose any such intention here. On the contrary, it discloses an intention to create a relationship analogous to that which exists between a corporation and its preferred shareholders. The interest petitioner acquired was called a "share", and the return which he was to receive a "dividend." While these appellations are not decisive, they can not be lightly ignored in determining the nature of the transaction. *Kentucky River Coal Corporation*, 3 B. T. A. 644, 649; *Greensboro News Co.*, 31 B. T. A. 812. Other indications that a shareholder relationship rather than that of debtor-creditor was intended are the provisions for payment of dividends out of net earnings, and the absence of a fixed maturity date for the retirement or repayment of the principal sum. *United States* v. *South Georgia Railway Co.*, 107 Fed. (2d) 3; *Haffenreffer Brewing Co.*, 41 B. T. A. 443 (C. C. A., 1st Cir.); *William Cluff Co.*, 7 B. T. A. 662, 669. It is apparent petitioner made a capital investment and acquired an ownership-beneficiary interest in Building Number One Trust, and we so hold. Any loss sustained by him in 1936 is not, therefore, deductible as a bad debt.

There remain for consideration the contentions of respondent (1) that petitioner is entitled to no deduction whatsoever with respect to the building trust and (2) that, if he suffered a loss in 1936, it was subject to the limitations of section 117 of the Revenue Act of 1936. These contentions will be considered together.

Respondent's argument in support of his contention that no deduction should be allowed may be briefly summarized. He says: Building Number One Trust owned one specific property; petitioner as the owner of all the preferred shares was the sole beneficiary thereof until these shares were fully retired, which never happened; and the mere conversion of his equitable interest in the property into a legal interest in 1936, when the legal title was conveyed to him, did not constitute such an event as to result in a deductible loss of any kind to petitioner. In this connection he relies upon certain *obiter dictum* contained in a decision rendered by the Circuit Court of Appeals for the Second Circuit in *Allen* v. *Commissioner*, 49 Fed. (2d) 716.

In the *Allen* case, the court held that one of several beneficiaries of a trust, the purpose of which was to secure a new bank against

unknown debts of a merged institution, was taxable on the gain resulting from a distribution to him by the trust of his pro rata share of certain securities. The court stated that the question whether gain or loss should or should not be recognized on such a transaction depended upon whether the distribution effected a substantial change in the beneficiaries' interest, and, if the change was enough to justify saying that they received new property for their former rights, then there was taxable profit, even though strictly the transaction were not an exchange under section 202 (c) of the Revenue Act of 1921. While holding that there was a sufficient change in that case, the court said:

It does not follow that the same would be true generally, as for example in the ordinary case of a trust of land, of one or of several parcels, for the benefit of a single *cestui que trust* or of voting trusts of corporate shares, where the *res* is a mass of fungibles to be returned in kind upon dissolution, or of similar transactions. The result may well vary with the relation of the beneficiaries to the fund while the trust is being administered. In any event we have to decide no more than the case before us.

In our opinion the quoted language is not authority for holding that the distribution to the petitioner of the corpus of Building Number One Trust did not effect such a substantial change in his interest as to warrant the recognition of gain or loss for tax purposes. Petitioner made an investment of $40,500 in preferred and common shares of the trust, which entitled him to receive all of the dividends on preferred shares until they had been retired at par and thereafter to receive his proportionate share of any dividend distributions on common shares. His right to receive the trust corpus as the owner of all the preferred shares was dependent upon the happening of a condition subsequent, viz., the failure of the trust to pay dividends on its preferred shares over a period of 18 months. This event occurred in 1936 and the trust property was transferred to him in that year, free of all claims of the holder of a majority of the common shares to share in its earnings and in the proceeds of the sale of the property upon the termination of the trust. Then for the first time he was free to exercise the complete dominion and control over the property which until then could be exercised only by the trustees. There was, therefore, a substantial change in his interest in the property and any gain or loss resulting from this change should be recognized for tax purposes.

Although the respondent urges on brief that petitioner has not proved the amount of the loss sustained by him in 1936, we are satisfied that he has done so. Petitioner paid $40,500 for all of the preferred shares and a minority interest in the common shares of Building Number One Trust. It is true, as respondent points out, that a portion of petitioner's cost was allocable to the common shares

(*Cyrus S. Eaton*, 37 B. T. A. 715, 718; *Collin* v. *Commissioner*, 32 Fed. (2d) 753), and that petitioner did not prove the amount allocable to them. This failure of proof is not fatal, however, since it is apparent from the evidence that the common shares did not become worthless until the trust had been in default in the payment of dividends on its preferred shares for a period of 18 months. This occurred in 1936, and the loss sustained by petitioner in that year on his investment in both preferred and common shares is the difference between the value of the property transferred to him (less the amount of the outstanding first mortgage) and his investment of $40,500 reduced by payments of $16,492.83 theretofore received in retirement of a portion of the preferred shares. When computed in this manner, the loss sustained is $10,757.17, the amount used by the respondent in determining the deficiency.

The remaining question is whether the loss sustained by petitioner is deductible in its entirety as an ordinary loss, or whether the deduction is limited by the provisions of section 117 of the Revenue Act of 1936, relating to losses sustained in connection with the sale or exchange of capital assets.

Both parties agree that Building Number One Trust was an association. We see no reason for holding to the contrary. *Morrissey* v. *Commissioner*, 296 U. S. 344; *Swanson* v. *Commissioner*, 296 U. S. 362 (in which a trust to operate a single building was involved); *Helvering* v. *Coleman-Gilbert Associates*, 296 U. S. 369; *Helvering* v. *Combs*, 296 U. S. 365; *Solomon* v. *Commissioner*, 89 Fed. (2d) 569. Section 1001 (a) (2) of the Revenue Act of 1936 provides that such associations shall be treated for tax purposes as though they were corporations. On December 4, 1936, petitioner, as holder of all of the preferred shares of the trust, received all of its property in accordance with the provision in the preferred share certificates that such a distribution should be made if there was a failure to pay dividends on such shares for a period of 18 months. Had such a distribution been made by a corporation it would be treated as a distribution in complete liquidation. When made by an association it must be accorded similar treatment. *Tyrrell* v. *Commissioner*, 91 Fed. (2d) 500. Section 115 (c) of the Revenue Act of 1936 provides that gain or loss is to be recognized with respect to amounts received in complete liquidation of corporations, and that such amounts are to be treated as in full payment "in exchange for the stock." Section 117 (a) of the Revenue Act of 1936 provides that "upon the sale or exchange of a capital asset" held by a taxpayer for more than 5 years but not for more than 10 years only 40 percent of any loss sustained shall be taken into consideration in computing net income. The shares of Building Number One Trust were a capital asset held by petitioner for approximately 9 years. He

is therefore entitled to deduct 40 percent of the loss sustained by him in 1936, in computing his net income for that year, as the respondent originally determined, and we so hold.

## Issue No. 2.

Section 23 (j) of the Revenue Act of 1934 provides that in computing net income there shall be allowed as deductions "Debts ascertained to be worthless and charged off within the taxable year."

In support of his contention that the $1,500 due on the Breen note should be allowed as a bad debt deduction in computing his net income for 1935, petitioner urges that he kept no regular set of books; that he mentally charged off the debt when it became outlawed in 1935; that he failed to deduct it in his return for that year because he was showing no tax due anyway; and that under certain decisions of the courts and this Board he is entitled to the claimed deduction.

The statute gives him no right to make a mere "mental" charge-off. In some cases it has been held that the second portion of the statute has been sufficiently complied with where it is shown that a taxpayer, keeping no books of account, deducted the amount of his alleged bad debt in a return, timely filed. *William H. Redfield*, 34 B. T. A. 967; *Estate of C. T. Grant*, 36 B. T. A. 1233. In another line of cases it had been held that, where a "charge-off" was made during the taxable year, the petitioner's right to take the deduction may be litigated in a proceeding involving the year the charge-off was made, even though no deduction was claimed in the return. *Estate of Henry N. Brawner, Jr.*, 36 B. T. A. 884; *Peters v. United States,* 10 Fed. Supp. 145. This petitioner would have us extend the doctrine of the cited cases to hold that a deduction may be allowed if a taxpayer ascertains a debt to be worthless, though he makes no attempt to make a charge-off within the taxable year or when he files his return and postpones making any attempt to deduct it until the Commissioner, three years later, determines a deficiency against him; but we do not believe that the doctrine should be so extended.

Even if petitioner's belated claim should, under the rationale of *William H. Redfield, supra,* be held to be a sufficient charge-off, petitioner has not proved to our satisfaction that there was an ascertainment of worthlessness within the purview of the statute. After stating that Breen had severed his connection with the Bridger bank in 1930 or 1931, and thereafter was engaged in managing farm properties, petitioner testified on cross-examination as follows:

Q During that period after he severed his connection with the bank, from 1930 or 1931, his financial condition remained approximately the same until 1938, did it not, as far as you know?

A Well, I don't know about that, what his financial condition was.

Q Did you make any effort during that period to find out what his financial condition was?

A I wrote him many times what he was going to do about his note, and he said he was out of a job and had a family to support. He had some prospects in land of striking oil, and he hoped to pay it.

Q You had written him inquiring a number of times during those years from 1930, say to 1935, had you not?

A Yes.

Q And each time you received the same reply to the effect you just stated?

A Yes, his condition stayed the same.

Petitioner also testified that nothing was paid on the note, and that he consulted an attorney concerning the commencement of a suit "along about in 1935 before the note became outlawed." The attorney advised against any suit "because most people after 1929 had very little left to pay any notes, especially Breen", and no suit was ever instituted on the note.

A taxpayer must exhaust all the usual and reasonable means of collecting a debt before there can be an ascertainment of worthlessness. Petitioner took no action to collect the debt other than an occasional letter asking Breen what he was going to do about the note. While legal action is not always necessary to prove that a debt is worthless, in the absence of such action it must appear from the surrounding circumstances that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment. Petitioner admits that he knew very little about the financial condition of Breen, other than the statements contained in his letters. These statements do not convince us that the debt became worthless or uncollectible in 1935. According to petitioner's testimony the conditions and prospects for payment were no poorer in that year than they had been for several years prior thereto. Breen always indicated his willingness to pay the debt as soon as he was in a position to do so. The only change in the situation in 1935 appears to have been the running of the statute of limitations. This Board has repeatedly held that the availability of such a defense to a debtor is not a sufficient ascertainment of worthlessness to justify a charge-off of a note or other debt. *Leo Stein*, 4 B. T. A. 1016; *Ralph H. Cross*, 20 B. T. A. 929; affd., 54 Fed. (2d) 781. In our opinion there was no ascertainment by the petitioner of the worthlessness of the Breen note in 1935. It follows that the claimed deduction may not be allowed.

## Issue No. 3.

At the hearing petitioner was permitted to introduce in evidence, over the objection of the respondent, two pages from "Moody's Manual of Investments" for the year 1936. One of these sheets contained the following statement of the assets and liabilities of the Central Public Utility Corporation as of December 31, 1935:

| Assets | | Liabilities | |
|---|---:|---|---:|
| Investments in subsidiaries: | | Preferred stock | $3,203,723 |
|   Consolidated Elec. & Gas Co.: | | Class A stock | 1,719,816 |
|     (a) Common stock | $1,000,000 | Common stock | 1,294,510 |
|     Class A and preferred stock | 49,197,501 | Funded debt | 41,575,703 |
|     Bonds and notes | 60,950 | Due to affiliate | 26,167 |
|   Central Securities Transfer Co | 18,022 | Reserve for issuance of securities | 1,447,632 |
|   Ohio Valley Transportation Co | 19,542 | Accrued liabilities | 6,043 |
|   Wisconsin Public Utility Co | 5,752 | Deferred credit | 30 |
| Other investments | 17,876 | Surplus | 1,054,739 |
| Cash | 5,976 | | |
| Accrued interest | 2,740 | | |
|     Total | [sic] $50,328,361 |     Total | [sic] $50,328,362 |

Notes immediately following the balance sheet state that the Central Public Utility Corporation owned all of the outstanding common and class A stock and 74,493 shares of $5 preferred stock of the Consolidated Electric & Gas Co.; that the value at which the class A and preferred stock are carried on the balance sheet, $49,197,501, is $40,268,201.49 in excess of the par or stated values on the books of Consolidated Electric & Gas Co.; and that no provision has been made in the balance sheet for accrued interest on 5½ percent income bonds of the Central Public Utility Corporation, which interest is cumulative from date of issue (in most instances, Aug. 1, 1932) and is payable upon maturity of the principal of the bonds if unpaid prior thereto.

Section 23 (k) of the Revenue Act of 1934 provides that "when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction." The Commissioner was not satisfied that the bonds owned by petitioner were worthless to the extent claimed in his return for 1935, and the question presented for our determination is "whether the evidence is sufficiently strong to require a holding that he reasonably should have been so satisfied." Bing & Bing, Inc., 35 B. T. A. 1170, 1177. We do not think it is. There is no evidence as to the market value of the bonds of the Central Public Utility Corporation as of December 31, 1935. In support of his contention that the bonds had little value on that date, petitioner attempted to prove that the principal asset of the corporation, the stock of the Consolidated Electric & Gas Co., was practically worthless. One witness for petitioner, a broker, testified that the stock was practically worthless on December 31, 1935, and based his opinion upon a statement to that effect in one of the investment services of which he was a subscriber. The only other evidence on this point is the statement in Moody's Manual, heretofore mentioned, that the class A and preferred stock of the Consolidated Electric & Gas Co. was carried on the balance sheet of the Central Public Utility Corporation at a figure of $40,268,201.49 in excess of the par or stated values on the books of Consolidated Electric & Gas Co.

The value of the assets of the Central Public Utility Corporation can not be determined from the testimony of petitioner's witness or from the statement contained in Moody's Manual. For aught that may be gleaned from the evidence, the stock of the Consolidated Electric & Gas Co. as of December 31, 1935, had a value greatly in excess of the par or stated values at which it was carried on the books of the issuing corporation. We are not convinced, therefore, that petitioner ascertained in 1935 that the financial condition of the Central Public Utility Corporation was such that he would recover on the maturity of its bonds only a part of the debt evidenced by them. It is our conclusion that the respondent's action in disallowing a deduction based upon the partial worthlessness of the bonds was not unreasonable, and this issue must be decided against the petitioner. Cf. *Ruth Wight Bill*, 38 B. T. A. 796; *Securities Allied Corporation* v. *Commissioner*, 95 Fed. (2d) 384, 386; certiorari denied, 305 U. S. 617.

Finding no error in the deficiencies originally determined by the respondent, we decline to increase or decrease them.

> *Judgment that there is a deficiency in the amount of $668.16 for 1935 and $506.99 for 1936 will be entered.*