HARRY F. CORNWALL AND BESS COVER CORNWALL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5147–65. Filed August 22, 1967.

*David Sachs,* for the petitioners.
*Paul H. Frankel,* for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in petitioners' income tax for the calendar year 1961 in the amount of $71,752.08. The issue for decision is whether the amount of a cash distribution made to one of petitioners by an association which is taxable as a corporation constituted ordinary income or long-term capital gain.

#### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners, husband and wife who resided at the time of the filing of the petition in this case in Westfield, N.J., filed their joint Federal income tax return for the calendar year 1961 with the district director of internal revenue at Newark, N.J.

Harry F. Cornwall, referred to hereinafter as petitioner, was engaged for many years in the insurance business. He was a member of Cornwall & Stevens, an insurance brokerage partnership. From some time prior to 1927 he has been a member of Lloyds, New York, an unincorporated, nonstock, underwriting association, operating under a certificate of authority from the superintendent of insurance of the Department of Insurance of the State of New York.

Lloyds, New York, referred to hereafter as Lloyds or the association, was organized in 1892 by three persons two of whom were petitioner's father and the father of Leighton H. Stevens. It has operated under its present name since 1909. Lloyds is engaged in the business of underwriting fire and allied lines, automobile physical damage, and inland marine risks. Lloyds is an association taxable as a corporation.

The brokerage firm, Cornwall & Stevens, sometimes referred to hereafter as the partnership, is engaged in the business of selling insurance. It is located in the same building as Lloyds and its address is the same as Lloyds. Approximately 70 percent of the business done by Lloyds comes from Cornwall & Stevens, which gives about half of its business to Lloyds. Originally all underwriters of Lloyds had been the participants in the brokerage business but this was not the situation in the years here involved and for some time prior thereto.

Under partnership agreements entered into on January 1, 1951, and again on January 1, 1956, the partners of Cornwall & Stevens were: Harry F. Cornwall, Dudley M. Moore, Leighton M. Stevens, Charles E. Seelig, William J. O'Hara, and John E. Johannesen. In 1957 petitioner ceased to be a partner in Cornwall & Stevens. Under a partnership agreement executed as of January 1, 1958, the partners of Cornwall & Stevens included all the prior partners except petitioner and William J. O'Hara, and, in addition, included Wayne D. Moore, a son of Dudley M. Moore.

The articles of association of Lloyds as of both July 1, 1957, and July 1, 1961, contain, among others, the following provisions:

*Second. Appointment of Attorneys.* Each of the Underwriters hereto shall execute and deliver to the attorneys-in-fact and managers, a power of attorney * * * giving to said attorneys the necessary power and authority to transact on behalf of the underwriters the business referred to in the first paragraph hereof.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

*Fourth. Duties of Attorneys-in-Fact and Managers.* The Attorneys-in-Fact and Managers shall have the power to take charge of all funds, assets and property * * * to direct the manner in which said property shall be kept or invested, used or applied, * * *; to supervise and make payment of all claims for losses; to collect all premiums and generally to supervise and control the conduct of the insurance business herein referred to and safeguard the respective interest of the underwriters.

*Fifth. Revocation of Power of Attorney. Withdrawal and Accounting.* Each of the parties hereto shall be at liberty to revoke his Power of Attorney and to

discontinue all further transaction of the business contemplated and such revocation shall become binding upon the said attorneys thirty (30) days from the receipt of notice in writing to that effect by said attorneys.

\*     \*     \*     \*     \*     \*     \*

Upon the withdrawal or retirement of an underwriter for any cause, or upon the death of any underwriter, neither the underwriter nor in the event of his death his estate shall have any right, title or interest in or to the charter, rights, or franchises of this Association, \* \* \* except the right to an accounting by the attorneys of all business done in his name, or on his behalf, and all moneys paid by the underwriter, including any contribution made to the surplus of the Association. But said surplus shall at all times be subject to the provisions of these Articles governing the same.

The account of such withdrawing, retiring or deceased underwriter shall not be closed until the end of the year next after the expiration of all risks in which he may have been concerned, and all sums to his credit in said accounting, and all moneys belonging to him in the hands of said attorneys, at the time being shall constitute a fund irrevocably pledged to the payment of all losses for which he or they may be or become liable, or for other indebtedness growing out of the transaction of the insurance business herein contemplated. The remaining underwriters may, however, upon proper provision being made for the assumption of said liability by any other or new underwriter taking the place of the underwriter withdrawing or dying, close the account of said underwriter at a date earlier than the date hereinabove fixed.

*Sixth. Contributions to surplus.* Each underwriter, upon becoming a member of the Association, and as a condition precedent to becoming an underwriter to said Association, shall contribute in cash, bonds, stocks or other securities approved by a majority of the underwriters, to the surplus of the Association a sum not less than Twelve Thousand Five Hundred ($12,500.) Dollars, the intention being that the money so contributed by the underwriters and members shall constitute a surplus or reserve fund for the payment of losses, and shall under no circumstances be returnable in whole or in part to any member so contributing except in the event of the assignment of his interest and the assumption of the same by another underwriter as herein provided for.

*Seventh. Limit of Liability.* In every policy issued under the arrangements herein contemplated, all of the parties hereto at that time shall become insurers, and each underwriter shall be and become severally liable under each and every policy so issued for the following percentages: [The names and percentage of liability of each member is set forth in this paragraph of the Articles.]

*Eighth. Interest of Underwriters in Association's Assets and Income.* The interest of each underwriter of the Association in the assets, funds and property thereof and in all profits or emoluments arising from the operation of its business shall be governed both by the respective capital account credited to each underwriter as defined in Article Eleven herein and also by the amount of liability assumed by the respective underwriter as covered by Article Seven above.

*Ninth. Compensation of Attorneys.* The compensation of the Attorneys-in-Fact, managers and deputy attorneys, if any, shall be on an annual basis and agreed upon by the underwriters at their annual meeting referred to in Article Three above, or at such other time during the year as may be designated.

\*     \*     \*     \*     \*     \*     \*

*Eleventh. Underwriters' Accounts.* There shall be kept a separate account for each underwriter and as soon as possible after the 31st of December of each year but not later than the following March 15, all of the accounts in connection with the business shall be made up and balanced. After such balance has been

approved by the underwriters, same shall then be credited to or debited against the various underwriters' accounts. In making the allocation of this profit or loss, each underwriter's credit or debit shall be governed by the underwriter's liability assumed and also by his capital account as shown on the books of the Association. *Withdrawals from underwriters' accounts may be made individually or collectively with the consent of the majority in interest of the underwriters as shown in Article Seven hereof.* However, no withdrawal may be made which impairs the total of the withdrawing underwriter's contributed surplus, his proportion allocated to the maintenance of a guaranty fund, if any, and his proportion of any legal reserve or other liability which in the opinion of the Attorneys-in-fact should be maintained. [Emphasis added.]

Lloyds holds an annual meeting and such special meetings as are required. Formal voting procedures are not observed. An agenda is presented to the members and agreement is reached orally. If unanimity is not to be had, the matter under discussion is held over for further consideration. If agreement is reached, it is usually signified by the members' executing the minutes of the meeting. A high degree of accord has existed among the associates and for many years no action has been taken without unanimous agreement of the members.

Lloyds earns its income from underwriting and investments. The income from underwriting is allocated to the capital accounts of the various members in accordance with their respective percentage liabilities, as set forth in the articles of association. The investment income is allocated to the members' capital accounts in the ratio of their respective capital interests. A member's share of liability and his capital interest are not necessarily identical. The names of the members of Lloyds, the underwriting percentage of each member, and the capital account of each at the dates shown were as follows:

| Underwriter | Underwriting percentage interest | Capital account | |
|---|---|---|---|
| | | Amount | Percent |
| *Jan. 1, 1957* | | | |
| Leighton H. Stevens | 35 | $720,968.22 | 33.48 |
| Clift Cornwall (petitioner's brother) | 25 | 563,087.03 | 26.15 |
| Harry F. Cornwall | 28 | 710,531.83 | 33.00 |
| Dudley M. Moore | 7 | 127,655.24 | 5.93 |
| Wayne D. Moore | 5 | 31,099.94 | 1.44 |
| | 100 | 2,153,342.26 | 100.00 |
| *July 1, 1957* | | | |
| Leighton H. Stevens | 40 | 694,584.79 | 37.56 |
| Clift Cornwall | 25 | 545,294.16 | 29.49 |
| Harry F. Cornwall | 21 | 452,723.58 | 24.49 |
| Dudley M. Moore | 8 | 125,673.28 | 6.80 |
| Wayne D. Moore | 6 | 30,659.33 | 1.66 |
| | 100 | 1,848,935.14 | 100.00 |
| *Jan. 1, 1961* | | | |
| Leighton H. Stevens | 40 | 849,826.80 | 37.29 |
| Clift Cornwall | 25 | 635,863.15 | 27.90 |
| Harry F. Cornwall | 21 | 567,978.46 | 24.92 |
| Dudley M. Moore | 8 | 166,065.06 | 7.29 |
| Wayne D. Moore | 6 | 59,372.28 | 2.60 |
| | 100 | 2,279,105.75 | 100.00 |

| Underwriter | Underwriting percentage interest | Capital account | |
|---|---|---|---|
| | | Amount | Percent |
| *June 30, 1961* | | | |
| Leighton H. Stevens | 40 | $870,338.71 | 40.14 |
| Clift Cornwall | 25 | 665,252.18 | 30.68 |
| Harry F. Cornwall | 21 | 395,627.29 | 18.25 |
| Dudley M. Moore | 8 | 174,015.88 | 8.03 |
| Wayne D. Moore | 6 | 62,802.90 | 2.90 |
| | 100 | 2,168,036.96 | 100.00 |
| *July 1, 1961* | | | |
| Leighton H. Stevens | 37½ | 870,338.71 | 38.38 |
| Clift Cornwall | 27½ | 665,252.18 | 29.33 |
| Harry F. Cornwall | 16 | 395,627.29 | 17.44 |
| Dudley M. Moore | 8 | 174,015.88 | 7.67 |
| Wayne D. Moore | 6 | 62,802.90 | 2.77 |
| Serena Merck | 5 | 100,000.00 | 4.41 |
| | 100 | 2,268,036.96 | 100.00 |
| *Jan. 1, 1962* | | | |
| Leighton H. Stevens | 55 | 948,646.09 | 38.56 |
| Estate of Clift Cornwall (deceased Dec. 28, 1961) | | 712,623.37 | 28.97 |
| Harry F. Cornwall | 16 | 429,971.72 | 17.48 |
| Dudley M. Moore | 12 | 189,910.71 | 7.72 |
| Wayne D. Moore | 9 | 71,089.61 | 2.89 |
| Serena Merck | 8 | 107,729.04 | 4.38 |
| | 100 | 2,459,970.54 | 100.00 |
| *July 1, 1962* | | | |
| Leighton H. Stevens | 50 | 864,173.10 | 37.14 |
| Estate of Clift Cornwall | | 594,785.97 | 25.56 |
| Harry F. Cornwall | 16 | 400,584.93 | 17.22 |
| Dudley M. Moore | 12 | 177,153.53 | 7.61 |
| Wayne D. Moore | 8 | 69,257.94 | 2.98 |
| Serena Merck | 8 | 100,627.45 | 4.33 |
| L. Palmer Brown III | 6 | 120,000.00 | 5.16 |
| | 100 | 2,326,582.92 | 100.00 |
| *Dec. 31, 1962* | | | |
| Leighton H. Stevens | 50 | 939,287.49 | 39.29 |
| Estate of Clift Cornwall | | 508,861.39 | 21.28 |
| Harry F. Cornwall | 16 | 433,052.07 | 18.11 |
| Dudley M. Moore | 12 | 193,122.55 | 8.08 |
| Wayne D. Moore | 8 | 76,935.20 | 3.22 |
| Serena Merck | 8 | 110,120.28 | 4.61 |
| L. Palmer Brown III | 6 | 129,335.53 | 5.41 |
| | 100 | 2,390,714.51 | 100.00 |
| *Jan. 1, 1963* [1] | | | |
| Leighton H. Stevens | 44 | 910,136.37 | 36.47 |
| Estate of Clift Cornwall | | 480,189.95 | 19.24 |
| Harry F. Cornwall | 10 | 200,000.00 | 8.02 |
| Dudley M. Moore | 9 | 189,822.96 | 7.61 |
| Wayne D. Moore | 6 | 76,674.99 | 3.07 |
| Serena Merck | 5 | 110,575.64 | 4.43 |
| L. Palmer Brown III | 6 | 127,677.14 | 5.12 |
| John N. Gilbert, Jr | 5 | 100,000.00 | 4.01 |
| Herbert C. Durkee | 5 | 100,000.00 | 4.01 |
| H. Fletcher Eggert, Jr | 10 | 200,000.00 | 8.02 |
| | 100 | 2,495,077.05 | 100.00 |

[1] Gilbert, Durkee, and Eggert were accepted as members *as of Jan. 1, 1963*. Lloyds distributed $206,275.22 to petitioner in March 1963 and his interest was decreased *as of Jan. 1, 1963*.
Other differences in the capital accounts between Dec. 31, 1962, and Jan. 1, 1963, result from the creation of an account for Estimated Capital Gains Tax on Unrealized Profits and the reduction of each capital account by its allocable share thereof.

Lloyds reported taxable income (before a deduction of 85 percent of dividends received) of $345,463.62 on its 1961 tax return. This was composed of $281,769.16 of underwriting income computed as follows:

| | | |
|---|---:|---:|
| Premiums earned | | $240, 672. 65 |
| Losses incurred | $163, 051. 54 | |
| Loss expenses incurred | 29, 601. 27 | |
| Commissions | (355, 024. 60) | |
| Other expenses | 121, 275. 28 | (41, 096. 51) |
| | | 281, 769. 16 |

The balance of reported income was from the taxable portions of dividends, interest, and long-term capital gain. The total amounts of these items without reduction for the nontaxable portions were:

| | |
|---|---:|
| Dividends | $26, 072. 60 |
| Interest | 37, 570. 08 |
| Net long-term gain | 99, 203. 02 |
| Total | 162, 845. 70 |

No expenses were deducted from these items.

Petitioner's active employment was in the brokerage business of Cornwall & Stevens, not with Lloyds. By letter dated June 27, 1956, he notified the partnership of Cornwall & Stevens that, in accordance with a provision of the partnership agreement, he desired to retire as of September 30, 1956, which was only 9 months in advance of the time when he would be automatically retired under the provision of the partnership agreement automatically retiring a partner upon his reaching age 67. The partnership agreement provided an option to the partners to participate in profits and losses for 5 years after retirement on the basis of the retiree's interest at the date of retirement rather than to withdraw his interest at once. Petitioner received payments from Cornwall & Stevens for 5 years under this provision. He was not active in the firm after October 1, 1956.

In 1957, petitioner informed Lloyds that he wished to withdraw his interest. Leighton H. Stevens, who in addition to owning the largest single share was one of the attorneys-in-fact of Lloyds, asked petitioner to withdraw serially, as this would make it easier to maintain the substantial capital required in the business. Petitioner agreed and Lloyds distributed $250,000 to him on June 14, 1957. Petitioner applied the basis of his interest in Lloyds of $87,266.52 to this distribution and reported $162,733.48 as long-term capital gain on his 1957 income tax return. Respondent did not challenge petitioner's method of reporting his income from this transaction.

After the June 1957 distribution, at yearend, petitioner's capital account stood at $447,380.16. It was subsequently subject to additions and distributions as follows, until 1961:

| Year | Additions | Distributions | Capital account at yearend 12/31 |
|------|-----------|---------------|----------------------------------|
| 1958 | $71,498.21 | None | $518,878.37 |
| 1959 | 32,541.52 | $2,500.00 | 548,919.89 |
| 1960 | 24,058.57 | 5,000.00 | 567,978.46 |

On March 16, 1961, at the annual meeting petitioner requested permission to withdraw $200,000. Petitioner again expressed his desire to withdraw completely, but again agreed at Stevens' request that he would withdraw only part of his capital account. At a special meeting of underwriters held on April 11, 1961, at which all of the associates except Clift Cornwall were present, it was unanimously agreed that petitioner could "withdraw two hundred thousand dollars ($200,000.00) * * * in partial liquidation of his interests" and that his "Underwriting Interest be reduced from 21% to 16% effective July 1, 1961." The amount of $200,000 was distributed to petitioner in April 1961. Because of the accounting problems incident to changing underwriting interests, these changes can best be made at a time when accounting statements are made and figures are more readily available. In addition to this distribution, Lloyds distributed $15,000 to Leighton H. Stevens and $5,000 to Clift Cornwall during 1961, which distributions were treated as dividends by the recipients. At all times during 1961, Lloyds had earnings and profits in excess of distributions made by it in that year.

At a special meeting of the underwriters on June 30, 1961, Serena Merck, a sister of Stevens, was accepted as a member. Knowing of petitioner's desire to withdraw, the members of Lloyds had previously been considering the capital requirements of the association and had decided that the value of Lloyds on the basis of capitalized earnings was $2 million and, therefore, that a 5-percent interest was worth $100,000. The superintendent of insurance of the State of New York approved Serena Merck as an underwriter in August 1961, at which time she paid in $100,000 for the acquisition of a 5-percent interest. The persons attending the meeting of June 30 and approving the admission of Serena Merck were Harry F. Cornwall, Dudley M. Moore, and Wayne D. Moore.

In March 1963, Lloyds distributed $206,275.22 to the petitioner. As of January 1, 1963, his underwriting interest was reduced from 16 percent to 10 percent.

The other persons who were admitted as members of Lloyds after 1961 made payments of amounts equal to $20,000 for each 1-percent interest.

Petitioner reported the $200,000 distribution which he received in 1961 as a long-term capital gain. Respondent in his notice of deficiency determined that this distribution constituted dividend income and not long-term capital gain and increased petitioner's taxable income as reported accordingly.

OPINION

Under sections 301, 317(a), and 316, I.R.C. 1954,[1] except as otherwise provided by statute, a distribution of money or other property made by a corporation to a shareholder with respect to its stock is a dividend includable in a taxpayer's gross income to the extent made out of the earnings and profits of the corporation. One of the exceptions is that set forth in section 302(a) which provides where a corporation redeems its stock within the meaning of section 317(b) and if section 302(b) (1), (2), (3), or (4) [2] applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

---

[1] All references are to the Internal Revenue Code of 1954, unless otherwise indicated.

[2] SEC. 302(b)   REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

(2) SUBSTANTIALLY DISPROPORTIONATE REDEMPTION OF STOCK.—

(A) IN GENERAL.—Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.

(B) LIMITATION.—This paragraph shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote.

(C) DEFINITIONS.—For purposes of this paragraph, the distribution is substantially disproportionate if—

(i) the ratio which the voting stock of the corporation owned by the shareholder immediately after the redemption bears to all of the voting stock of the corporation at such time,

is less than 80 percent of—

(ii) the ratio which the voting stock of the corporation owned by the shareholder immediately before the redemption bears to all of the voting stock of the corporation at such time.

For purposes of this paragraph, no distribution shall be treated as substantially disproportionate unless the shareholder's ownership of the common stock of the corporation (whether voting or nonvoting) after and before redemption also meets the 80 percent requirement of the preceding sentence. For purposes of the preceding sentence, if there is more than one class of common stock, the determinations shall be made by reference to fair market value.

(D) SERIES OF REDEMPTIONS.—This paragraph shall not apply to any redemption made pursuant to a plan the purpose or effect of which is a series of redemptions resulting in a distribution which (in the aggregate) is not substantially disproportionate with respect to the shareholder.

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

(4) STOCK ISSUED BY RAILROAD CORPORATIONS IN CERTAIN REORGANIZATIONS.—Subsection (a) shall apply if the redemption is of stock issued by a railroad corporation (as defined in section 77(m) of the Bankruptcy Act, as amended) pursuant to a plan of reorganization under section 77 of the Bankruptcy Act.

(5) APPLICATION OF PARAGRAPHS.—In determining whether a redemption meets the requirements of paragraph (1), the fact that such redemption fails to meet the requirements of paragraph (2), (3), or (4) shall not be taken into account. If a redemption meets the requirements of paragraph (3) and also the requirements of paragraph (1), (2), or (4), then so much of subsection (c)(2) as would (but for this sentence) apply, in respect of the acquisition of an interest in the corporation within the 10-year period beginning on the date of the distribution shall not apply.

Section 317(b) states that "stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock." Section 302(b)(1) includes within redemptions in which distributions are to be treated as payment in exchange for stock those redemptions which are not "essentially equivalent to a dividend," and section 302(b)(2) includes within such redemptions those which are "substantially disproportionate with respect to the shareholder."

Petitioner in the instant case takes the position that the payment by Lloyds to him in 1961 was a redemption of a portion of his capital interest in that association which should be treated as the equivalent of a redemption of stock and that this redemption meets both the provisions of section 302(b)(2) of being substantially disproportionate and the provisions of section 302(b)(1) of being a redemption which is not essentially equivalent to a dividend.

Respondent states in his brief that he does not concede that the payment to petitioner was in effect in "redemption of stock." He does not argue this point but argues that even if the payment to petitioner is considered as in redemption for stock, it does not meet the provisions of any paragraph of section 302(b). Since respondent has raised the question of whether the payment to petitioner should be treated as a redemption of stock we will consider this question.

Lloyds is an association taxable as a corporation. It has members with various participating interests and so far as the record shows the members' ownership of an interest in the association is not evidenced by any document in the nature of a certificate of stock or participation, but is evidenced by the record of their percentage participation and capital interest on the books of Lloyds. Respondent by treating Lloyds as an association taxable as a corporation has in effect recognized that such an association can be so taxable without having its members' interest evidenced by certificates of stock. In any event, it has long been settled that a trust or other association may be taxable as a corporation where no certificates or other type of document similar to stock certificates representing each individual's interest therein are issued. *Reinecke* v. *Kaempfer*, 72 F. 2d 469 (C.A. 7, 1934). In fact as pointed out in *Reinecke* v. *Kaempfer*, *supra*, not all corporations organized as such under the laws of the various States actually have "shares of stock." However, it is because of the "resemblance in form and effectiveness" to a corporation that certain "business organizations" are caused to be taxable as a corporation. *Burk-Waggoner Assn.* v. *Hopkins*, 269 U.S. 110 (1925). See also *Sherman* v. *Commissioner*, 146 F. 2d 219 (C.A. 6, 1944), affirming a Memorandum Opinion of this Court. Since Lloyds is considered for Federal tax purposes to be a corporation, its

members' interests must be considered as stock. In fact, it is because of this viewing of members' interests as stock of a corporation that distributions with respect thereto are considered dividends. See *Smith* v. *Commissioner*, 69 F. 2d 911 (C.A. 3, 1934), affirming 27 B.T.A. 607 (1933).

In numerous cases it has been held that where a trust or other association is taxable as a corporation, it is to be "treated as a corporation for all purposes of the revenue act." *Pierce Oil Corporation*, 32 B.T.A. 403, 429 (1935). It has likewise been recognized that not only is the association taxable as a corporation but that in determining the tax liability of a member or shareholder of an association taxable as a corporation, distributions made by the association to its members or shareholders must be treated as would distributions made by a corporation to its shareholders. *Charles N. Spratt*, 43 B.T.A. 503, 511 (1941), and *Tyrrell* v. *Commissioner*, 91 F. 2d 500 (C.A. 5, 1937), affirming 34 B.T.A. 707 (1936). Both of these cases dealt with distributions in liquidation. However, it would follow that a distribution which canceled a part of a member's or participant's interest in the association should be considered as the association's acquiring "its stock from a shareholder" which constitutes a redemption of stock under section 317(b).

Having concluded that when Lloyds paid $200,000 to petitioner in 1961 reducing his underwriting percentage which controlled his participation in underwriting income and reducing his capital account which controlled his participation in investment income of the association, the effect was that Lloyds redeemed a portion of petitioner's "stock" in the association, it is necessary to determine whether this redemption shall be treated as a distribution in part or full payment in exchange for stock. If it is to be so treated, petitioner has correctly reported the $200,000 as a capital gain since petitioner had previously recovered all of his basis in the stock.[3] If the distribution is not considered to be a redemption which is to be treated as a payment in exchange for stock, then the amount distributed to petitioner is a dividend taxable in full to petitioner as ordinary income since the facts show that Lloyds had accumulated earnings and profits in excess of the amount distributed to petitioner.

Petitioner contends that the facts here cause both section 301(b)(1) and section 301(b)(2) to apply to the redemption. He points out that immediately after the redemption he owned less than 50 percent of the voting power of the association (sec. 302(b)(2)(B)) and that the

---

[3] We are not required to decide whether petitioner properly offset his entire basis in his interest in Lloyds against the distribution he received in 1957 since neither party is contending that petitioner had any basis in his interest in Lloyds in 1961. Each party appears to consider petitioner's deduction of his full basis in his interest in Lloyds from the distribution made to him in 1957 to be in error.

ratio of the voting interest he owned immediately after the redemption to all the voting interest in the association at that time was less than 80 percent of the ratio of the voting interest in the association which he owned immediately before the redemption to all the voting interest in the association at that time. Petitioner further points out that the reduction in his capital interest also met the 80-percent requirement.

Respondent takes the position that since Lloyds voted by members and not by participating interests, except with respect to the approval of withdrawals from underwriters' accounts, there was no reduction in petitioner's voting interest when he received the $200,000 distribution. Respondent makes some argument that petitioner's underwriting interest was not reduced from 21 percent to 16 percent immediately after the distribution but was so reduced at a later time.

The facts do not support respondent with respect to the reduction in petitioner's underwriting interest not being immediately after the distribution. The evidence shows that the reduction from 21 percent to 16 percent in petitioner's underwriting participation was an integral part of his withdrawal of the $200,000 from his capital account. The actual distribution was made to him a few months earlier than the reduction in his underwriting participation on the association's books because Lloyds was still considering the acceptance of a new member to subscribe to that 5-percent interest which would have to be reassigned and it was only practicable to change the underwriting participations at the time of year when Lloyds' books were audited and adjusted.

We conclude that the reduction in petitioner's underwriting participation from 21 to 16 percent was an integral part of his withdrawal in 1961 of $200,000 from his capital account.

The facts do support respondent in his contention that voting rights in Lloyds are not completely geared to a member's underwriting interest. As respondent points out, there is a reference in article six of the articles of association of Lloyds to the contribution to be made by an underwriter upon becoming a member of the association being in cash, stocks, bonds, or other securities "approved by a majority of the underwriters," and there is also a reference in the ninth article to the compensation of the attorney-in-fact and managing and deputy attorneys being "agreed upon by the underwriters." There is also a reference in the eleventh article to the accounts being balanced and such balance being "approved by the underwriters." The evidence shows that as a practical matter, all actions of Lloyds have for many years been by the unanimous agreement of the underwriters. Leighton H. Stevens testified:

If we had a disagreement on a matter of substance, the majority interest would have to have its way. The minority interest would have to give way to it. We

have had, as I tried to explain, a unanimous consent to everything that's been done for twenty-five years.

\*       \*       \*       \*       \*       \*       \*

If you want to go back prior to 1941, we had a disagreement over who would be an attorney in fact back in the late thirties, and the majority interest appointed the attorney in fact.

The opinion of Leighton H. Stevens as to what would happen in case of disagreement, plus the ambiguous references to approval of actions by the members or by a majority of the members in the articles of association of Lloyds, does not show that the voting in connection with the management of the company was by underwriting interests except with respect to withdrawals. The articles of association provide that a member may make a withdrawal on approval of "a majority in interest." The very fact that the provisions of the articles of association vary as to the voting on different matters supports respondent's position that voting is not strictly by underwriting interests.

The cases cited by petitioner with respect to what constitutes "voting stock" such as *Atlantic City Co.* v. *Commissioner*, 288 U.S. 152 (1933) consider "voting stock" to be stock with the right to vote with respect to the management of the company which generally means the election of directors. In Lloyds members manage the association so that it might be said that the interest of each member is "voting stock." However, the question here is not merely whether petitioner's interest is voting stock, but to what extent his voting interest was reduced when there was $200,000 distributed to him in 1961. Petitioner has shown that the distribution to him was substantially disproportionate in that no other stockholder obtained any comparable or nearly comparable distribution and he has shown that his underwriting interest in Lloyds was reduced by 23.81 percent and his capital interest by 26.77 percent. He has not shown that his voting or management interest was reduced except with respect to voting on withdrawals which may be made by a member only with the consent of the majority in interest of the underwriters. For this reason petitioner has failed to show that he meets precisely the technical requirement of section 302(b)(2).

Section 302(b)(5) provides that the fact that the redemption of stock fails to meet the requirement of paragraph 302(b)(2) is not to be taken into account in determining whether the redemption meets the requirements of paragraph 302(b)(1) which provides that a redemption is to be treated as a distribution in part or full payment in exchange for stock if it is not essentially equivalent to a dividend. This section may apply to the redemption of any type of stock.

Respondent argues that in determining whether the redemption of petitioner's interest in Lloyds was essentially equivalent to a dividend

we should consider the various criteria set forth by this Court in *Genevra Heman*, 32 T.C. 479, 487 (1959), affd. 283 F. 2d 227 (C.A. 8, 1960). In that case we stated that among the factors to be considered were:

The presence or absence of a bona fide corporate business purpose; whether the action was initiated by the corporation or by the shareholders; did the corporation adopt any plan or policy of contraction, or did the transaction result in a contraction of the corporation's business; did the corporation continue to operate at a profit; whether the transaction resulted in any substantial change in the proportionate ownership of stock held by the shareholders; what were the amounts, frequency, and significance of dividends paid in the past; was there a sufficient accumulation of earned surplus to cover the distribution, or was it partly from capital. * * *

It is respondent's position that the distribution to petitioner in 1961 cannot qualify as not essentially equivalent to a dividend under these criteria.

Petitioner takes the position that although these factors were properly to be considered in determining whether a redemption is essentially equivalent to a dividend under the provisions of section 115(g) of the Internal Revenue Code of 1939 they are not the pertinent factors under section 302(b)(1). We have pointed out in several cases differences in the provisions of section 115(g) of the Internal Revenue Code of 1939 and the provisions of section 302 of the Internal Revenue Code of 1954. See *Thomas G. Lewis*, 35 T.C. 71 (1960), and *Estate of Arthur H. Squier*, 35 T.C. 950 (1961). However, in considering the question of whether a redemption is essentially equivalent to a dividend in cases to which section 302(b)(1) is applicable, we have applied many of the criteria applied in determining this issue in cases to which the provisions of section 115(g) of the Internal Revenue Code of 1939 are applicable. See *Estate of Arthur H. Squier*, *supra* at 956. In cases governed by the provisions of section 115(g) of the 1939 Code as well as those governed by section 302(b)(1) this Court and other courts have considered the issue to be basically factual and that the weight to be given to the various elements should be determined in the light of all the facts. *Bradbury* v. *Commissioner*, 298 F. 2d 111 (C.A. 1, 1962), affirming a Memorandum Opinion of this Court, and *Perry S. Lewis*, 47 T.C. 129 (1966). In the instant case petitioner had the desire to withdraw entirely his interest in Lloyds but was persuaded not to do so because of Lloyds' need for the maintenance of capital to carry on its type of business. Although petitioner makes some argument that the withdrawal was a part of a series of withdrawals to effect complete liquidation of his interest, he does not seriously press this issue. So far as the evidence shows there was no precise plan as to when, if ever, petitioner's full interest would be withdrawn. However, the fact that it was petitioner's desire to withdraw entirely but for considerations of the

association he only withdrew a part of his interest, is a factor indicating that the redemption was not essentially equivalent to a dividend. Cf. *Estate of Oscar L. Mathis*, 47 T.C. 248 (1966). The fact that petitioner's withdrawal was made to further his desire to withdraw entirely from participation in Lloyds is given added importance when accompanied as here by the amount of the withdrawal in the current year causing a substantial change in his participating rights in the association, the change being in excess of 20 percent with respect to his participation in both the underwriting income and losses and the investment income. The fact that no comparable change occurred with respect to the other members of Lloyds causes the economic reality of the relationship between petitioner and the other members of the association to be materially altered. This is a factor to be given considerable weight in considering whether a distribution is essentially equivalent to a dividend. See *Bradbury* v. *Commissioner, supra*, and *Perry S. Lewis, supra.*

The many cases involving section 115(g) of the 1939 Code and section 302(b)(1), particularly those dealing with redemptions of preferred stock, are difficult to reconcile. As has been noted in numerous cases, the major attributes of common stock in a corporation are the right to vote, the right to share in corporate earnings, and the right to share in the assets on liquidation. Often preferred stock carries no right to vote and a fixed rate of sharing in earnings and assets on liquidation. Generally, preferred stock is "preferred" as to a stated percentage participation in earnings and in the assets on liquidation. Quite often it is redeemable at the option of the corporation. Because of these differences in the attributes of preferred stock and common stock, the element of a disproportionate distribution has generally been considered to be of more weight in determining whether a redemption is essentially equivalent to a dividend in the case of preferred stock than in the case of voting common stock. Particularly has this been the situation where the individual who obtains the disproportionate distribution is not a majority stockholder and holds only preferred stock.

In the instant case a member's interest in Lloyds has some of the attributes of common stock and some of preferred stock and lacks some of the attributes of each. Preferred stock must have some "preference" over another class of stock or interest in a corporation. All members of Lloyds had comparable rights and interests although their underwriting interest and interest in the investment income might not be proportionately the same. Therefore, a member's interest in Lloyds has certain qualities which differ from a preferred stock interest. As heretofore pointed out, a member's interest in Lloyds is not strictly comparable to a common stock interest. However, from the very nature of the rights which go with an interest in Lloyds, very important

factors indicating that the distribution to petitioner was not essentially equivalent to a dividend are the disproportionate amount of that distribution as compared to distributions to other members, the amount of the distribution as compared to distributions regularly made by Lloyds, the requirement of approval of the underwriters for the withdrawal, and the fact that the distribution was accompanied by a reduction in petitioner's underwriting participation as well as a reduction in his percentage participation in investment income. Also, a fact to be considered is that the distribution was made as a result of petitioner's request to withdraw from participation in Lloyds.

Considering all of the factors here present, we conclude that the redemption in 1961 of a portion of petitioner's interest in Lloyds was not essentially equivalent to a dividend and that petitioner correctly reported the $200,000 which was distributed to him by Lloyds as long-term capital gain.

*Decision will be entered under Rule 50.*