EDWIN I. NEWMAN AND GLORIA W. NEWMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Newman v. Commissioner
Docket No. 4130-79.
United States Tax Court
T.C. Memo 1982-61; 1982 Tax Ct. Memo LEXIS 685; 43 T.C.M. (CCH) 474; T.C.M. (RIA) 82061; February 10, 1982. *685 1. Petitioners' interests in three unimproved parcels of real estate sold by petitioners during the years in issue were capital assets and the gain on such sales was properly reported as capital gain. 2. Petitioners' interest in the "Choate" property was held no longer than 6 months and the gain on the sale thereof was a short-term capital gain. 3. The $ 20,000 advanced to petitioners by Sam Ingram to hold for possible investment became a debt from petitioner to Ingram and amounts paid thereon as interest were deductible by petitioner. An additional $ 5,000 paid by petitioner to Ingram was not deductible either as interest or as a loss under section 165(c)(2). 4. Newmark, a partnership in which petitioners had a 57 percent interest, made a payment on a note in 1974 which the parties agreed was to be applied to principal. None of the payment was deductible by Newmark as interest. 5. Petitioners failed to prove entitlement to travel and entertainment expenses in 1972 in excess of amounts allowed by respondent. 6. Petitioners failed to prove that debts owed him by Lancaster became worthless in either 1973 or 1974. 7. Respondent failed to carry his burden of proving that *686 any part of the underpayment of tax required to be shown on petitioners' return for 1973 was due to fraud. John H. Birkeland and Kenneth D. Willis, for the petitioners. Jeff P. Ehrlich, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Taxable year
Additions to Tax
ended Dec. 31,
Deficiency
Sec. 6653(a) [1]
Sec. 6653(b)
1972
$ 53,015
$ 2,651
1973
90,587
$ 45,295
1974
31,467
After numerous concessions by the parties, the issues remaining for decision are: (1) Whether for each of the taxable years in issue the gain recognized from the sale of an interest in three parcels of real estate was properly reportable as capital gain or ordinary income, and if capital gain is the correct treatment, whether the interest in one of these parcels was held longer than six months so as to qualify as long-term capital gain; (2) Whether for the taxable years 1972 and 1973 petitioners are entitled to a deduction in part for interest pursuant to section 163(a), *687 and in part for a loss on a transaction entered into for profit pursuant to section 165(c)(2) for certain payments made to Sam Ingram; (3) Whether for the taxable year 1974 a partnership in which petitioner Edward Newman owned a 57 percent interest suffered a loss entitling petitioners to deduct 57 percent of such loss; (4) Whether for the taxable year 1972 petitioners are entitled to a deduction under section 212 for travel and entertainment expenses; (5) Whether for the taxable year 1973 or 1974 petitioners are entitled to a nonbusiness bad debt deduction under section 166(d); and (6) Whether for the taxable year 1973, petitioners are liable for an addition to tax imposed under section 6653(b) for fraudulent underpayment of tax required to be shown on their income tax return. General Findings of Fact
Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Edward I. Newman and Gloria W. Newman, husband and wife, resided in Houston, Tex., at the time of filing the petition herein. During the taxable years in issue, petitioners resided in Littleton, Colo. They *688 filed their joint Federal income tax returns for each of the taxable years in issue with the Internal Revenue Service, Ogden, Utah. Gloria W. Newman is a party herein solely by virtue of having filed a joint return with Edward I. Newman (hereinafter petitioner). Petitioner was licensed in both Colorado and Texas as a civil engineer and was also a registered land surveyor in Colorado. In 1962 he unsuccessfully ran for the office of County Surveyor of Adams County, Colo., where he had resided since 1955. Petitioner was employed by the City of Aurora [2] as City Engineer from 1964 until May 1968, at which time he became a partner in a civil engineering firm known as Engineering Services of Colorado, Inc. (hereinafter Engineering Services). In 1968 petitioner, who was a member of the Republican Party, was elected for a 4-year term to the Colorado General Assembly as a State Representative. As such, he represented an area comprised primarily of eastern Adams County, which included Aurora. While serving in this capacity, petitioner was a member of the Transportation, Local Government, Finance and Natural Resource Committees. Although the *689 General Assembly was only in session for the first 5 or 6 months of 1972, petitioner continued to be involved a various committee meetings thereafter. During the period in which petitioner served as a State Representative, he continued to work as a civil engineer with Engineering Services because he needed the extra income. [3] In addition, petitioner performed engineering consulting services as a sole proprietor during the taxable year 1972, and, to a lesser extent, during 1973 and 1974 as well. Petitioner sold his interest in Engineering Services in 1973. Petitioner ran for reelection to the General Assembly in 1972, but was defeated in the primary election held in September of that year. During this same year petitioner was also involved in Bill Armstrong's election campaign for the United States Senate. In addition to these activities, petitioner was engaged in various business ventures throughout the taxable years in issue. These ventures included ranching, a sailboat distributorship, the invention of an instrument to be used in aircraft, and the *690 acquisition of certain interests in real property. The majority of the asserted deficiency for each of the taxable years in issue arises as a result of the sale of three of these real property interests. Real Estate Sales - Capital Gain Versus Ordinary Income
In 1972, petitioner, together with at least one other investor, formed a limited partnership known as the Newmark Partnership (hereinafter referred to as either the partnership or Newmark) for the purposes of acquiring property located in Thorton, Colo. (hereinafter Thorton property). Petitioner owned a 57 percent interest in the partnership and was entitled to 57 percent of its profits and losses. Petitioner sold his interest in the partnership in 1976, at which time it still owned the Thorton property. On July 1, 1973, petitioner acquired a 25-percent interest in an apartment house located in Seattle, Wash. His wife, brother, and sister-in-law each owned a 25-percent interest as well. The apartment house was purchased as an investment to generate a cash flow plus favorable tax benefits and to be held for "long term appreciation." In addition to the above acquisitions, petitioner acquired an interest in three parcels of *691 land located in Adams County, one of which was acquired in 1971 and two in 1972. It is the disposition of these interests which gives rise to much of the dispute herein. Petitioner's history of ownership with respect to each interest is described below. The Custy Property - On December 29, 1972, petitioner entered into a "Specific Performance Contract" to purchase property owned by, among others, the Estate of Stephen J. Custy. The property contained approximately 380 acres and the option price was $ 962,500 or $ 2,500 per acre. [4] Petitioner hoped that a portion of the property could be developed as a mobile home park, and for residential and commercial purposes. By virtue of engineering work he had performed in the area of the Custy property, petitioner was aware of the possible existence of water located *692 below such property. Without an independent water supply, the water for the property would have to be obtained from either the City of Denver or Aurora and if obtained from Denver there was a strong likelihood that the property would be annexed by the City and County of Denver. In view of the property's independent water supply, petitioner was hopeful that his request for rezoning would be granted. In regard to development of the Custy property, petitioner, in early March 1972, applied for and was granted at least three water well permits, and had plans for a sewage system for the property prepared. The Planning Commission approved petitioner's application for rezoning on March 14, 1972, but only with respect to mobile home use. Rezoning for residential and commercial uses was denied. Petitioner had originally planned to finance the purchase of the Custy property and development of the northern portion by obtaining numerous investors. Unfortunately, these investors did not materialize. Petitioner had no experience developing mobile home parks, other than in an engineering capacity. This fact, when combined with the Planning Commission's approval of rezoning only for mobile *693 home use and the lack of interested investors, led petitioner to grant to Duncan Clark (hereinafter Clark) on April 29, 1972, an option to purchase the portion of his specific performance contract which encompassed the northern portion of the Custy property. In consideration for this option, Clark agreed to pay petitioner a total of $ 650,000, $ 188,000 to be received at closing and $ 461,500 to be paid in ten annual installments of $ 46,150 each. Clark had come into contact with petitioner when he was inspecting a parcel of land for possible mobile home park development. The parcel had certain problems and its owner suggested that Clark speak with his engineer, who was petitioner. At that time, petitioner indicated that he had a contract to purchase the Custy property, a portion of which might be suitable for Clark's purposes. Clark had been in the mobile home park business since 1946 and knew that obtaining rezoning for development of a mobile home park could bedifficult. In view of the Planning Commission's recommendation that the northern portion of the Custy property be rezoned for mobile home park use, the property's suitability for mobile home park development and the *694 reasonableness of the price solicited, Clark was agreeable to the option provided petitioner would aid Clark in obtaining two additional water well permits for the northern portion. On May 9, 1972, the Board of County Commissioners (the Board) approved the Planning Commission's recommendation that the northern portion of the Custy property be rezoned for mobile home park use. Thereafter, on June 30, 1972, Clark exercised his option and purchased from petitioner the part of the specific performance contract relating to the northern portion of this property and subsequently, on July 1, 1972, purchased such portion. In respect of this purchase, petitioner was paid $ 188,000 in 1972; $ 46,150 in 1973 and $ 119,342 in 1974. At the time of the closing on July 1, 1972, petitioner purchased the remaining portion of the Custy property (hereinafter the Newman portion) which encompassed 160 acress. The property was used by petitioner for reaching, although approximately 40 acres were leased to Ken Custy for growing corn. By virtue of his sale to Clark, petitioner was able to purchase the Newman portion of the Custy property without the assistance of other investors. The Fowler-Fritzler *695 Property - On April 10, 1972, petitioner acquired an option to purchase property known as the Fowler-Fritzler property. [6] He exercised his option and purchased the property on June 30, 1972, for $ 400,000. Petitioner acquired the property with the intent to develop it through syndication, although at the time of acquisition he had no specific plans as to the type of such development. Petitioner thought the property would be a good investment, especially if the northern portion of the Custy property was developed by Clark and water was located on such property. In order to attract investors for the property, petitioner attempted to have the property approved for rezoning. He applied to the Planning Commission to have the property rezoned from agricultural use limitations to residential, commercial, mobile home park and vacation campground uses. On November 11, 1972, the Planning Commission sent its recommendations to the Board that each of the zoning requests be denied. Thereafter, on January 8, 1973, the Board adopted each of the recommendations submitted, except that which pertained to mobile home park *696 use, for which petitioner was given zoning approval if certain contingencies were met. Petitioner did not, however, proceed with the development of the Fowler-Fritzler property as a mobile home park. This decision was based on the then current status of the economy, the slow development of the northern portion of the Custy property and the restrictions being put on water well developments by the State of Colorado. A real estate agent contacted petitioner in May 1973 with respect to the purchase of this property on behalf of Pacific Western Mobile Estates, Inc. (hereinafter Pacific Western). Petitioner sold the property to Pacific Western on August 15, 1973, for $ 911,196, of which $ 251,036 was received in 1973. Petitioner had not solicited the sale of this property in any way. The Choate Property - Property owned by the estate of Margie Choate (hereinafter the estate) was placed on the market for sale in 1970. This property encompassed 9.4 acres, and contained a gravel supply. In April of 1972 petitioner became interested in purchasing the property after being approached by David Berger (hereinafter Berger), attorney for the estate. [7] Petitioner's interest was spurred by his *697 desire to enter the development business, and his belief that the property, even absent any development on his part, was a good investment in view of its location [8] and gravel supply. Thereafter, on May 1, 1972, petitioner signed a "Specific Performance Contract" (hereinafter the document) for the purchase of such property, paying $ 1,000 at that time, with $ 84,000 remaining to be paid at closing. This document was brought to petitioner by Berger, who stated to petitioner that, if he would make the offer presented therein, the estate would "go along" with it. The document was dated May 1, 1972, and petitioner's signature was given on such date. [9] The administratrix of the estate did not date her signature due to an oversight by Berger. The sale of the Choate property was subject to court approval, and on May 10, 1972, an "Order for Sale of Real Estate" was filed in the District Court of Adams County with respect to this property. This order was approved by the Court on June 10, 1972. Although the property could not have actually been sold prior to receiving court approval, Berger stated *698 that executing a contract to sell, contingent upon court approval, was permissible. After signing the contract to purchase the Choate property, Paul Beck, Mayor of Aurora (hereinafter the mayor) notified petitioner that Aurora had been interested in purchasing this property [10] *699 and was upset that petitioner had acquired the property "right out from under us." The mayor wanted petitioner to sell the contract for the purchase of the property to Aurora. Petitioner refused to do so because of possible implications of political impropriety due to his position as State Representative for Adams County. Thereafter, petitioner was approached by King Houston (hereinafter Houston) with respect to the purchase of the Choate property. Houston proposed that petitioner sell the contract to him, and in return Houston would sell the gravel to Aurora at a price agreeable to it. In order to remain in the good graces of Aurora, petitioner agreed, contingent upon Houston and Aurora coming to an agreement on the sale and purchase of gravel. On October 24, 1972, Aurora and Houston reached such an agreement. Consequently, on November 8, 1972, petitioner sold the contract to Houston and B. A. Heffley for $ 117,287, and they bought the property from the estate on the same day. At no time while petitioner held the contract to purchase the Choate property did he engage in any rezoning, improvement or development with respect to such property. Prior to acquiring the specific performance contract to purchase the Custy property on December 29, 1971, petitioner had never been *700 involved in any real estate activity other than the purchase and sale of his personal residence. Subsequent to 1973, petitioner made no acquisition of real estate other than his personal residence. Petitioner has never applied for a license qualifying him to sell real estate as either a broker or agent and, other than in his capacity of civil engineer, he has never been involved in the platting or subdividing of property for resale. For each of the taxable years in issue, petitioner reported all amounts received in respect of the sale of his interest in all three of the above properties as long-term capital gain. In his statutory notice of deficiency, respondent determined that the gain recognized in respect of each of these sales was ordinary income. There is no dispute between the parties on the amount of gain realized on the sale of any of the above property interests; only on the character of the gain. payments to Sam Ingram
In the spring of 1972, Sam Ingram (hereinafter Ingram), a friend of petitioner, contacted petitioner and indicated he was interested in investing $ 20,000 in real estate. At that time, petitioner was attempting to attract investors with respect to the *701 Fowler-Fritzler property. Therefore, in June 1972, he agreed to take the $ 20,000 offered by Ingram. It was decided, however, that no interest in such property would be transferred by petitioner at that time, but rather that the money would simply be held by petitioner until sufficient investor interest had been generated to justify proceeding with development of the property. Ingram requested and petitioner paid $ 984 as interest on this money in 1972. [11]
Ingram had obtained the $ 20,000 in a loan transaction from the United Bank of Denver wherein he borrowed $ 25,000. In 1973, he became involved in a divorce proceeding and notified petitioner that he wanted his money back. After being so notified but before actually repaying such amount, petitioner was notified by Ingram's father-in-law that he expected petitioner to repay $ 25,000, not $ 20,000, since this was the amount Ingram had told him he had given to petitioner. The father-in-law indicated that unless $ 25,000 was paid back, he would institute legal action with respect to the property, asserting that Ingram *702 had acquired an equity interest. In order to avoid any title problems on the Fowler-Fritzler property, petitioner paid Ingram $ 25,984 [12] in June 1973. Petitioner deducted $ 984 as interest for the taxable year 1972 and $ 5,984 as interest for the taxable year 1973. Respondent disallowed these deductions in their entirety. Partnership Loss
Petitioner owned a 57 percent interest in the Newmark partnership which had been formed with respect to ownership of the Thorton property. The partnership had borrowed a certain sum of money in 1972 and pursuant to a note in respect of this loan, was to pay $ 22,799.51 as interest and $ 3,257.49 as principal for 1974. However, in accordance with an agreement entered into sometime during 1974, the terms of the 1972 note were modified, providing that the entire 1974 payment ($ 26,057) was to reduce the principal balance of the loan, and the interest that was due ($ 22,799.51) would *703 be added to the remaining principal balance. For the taxable year 1974, the partnership reported a loss of $ 25,760, which was largely attributable to a $ 26,057 [13] deduction for interest expense. As a 57-percent owner of the partnership, petitioner reported a loss of $ 14,709 on Schedule E of his return for the taxable year 1974. Respondent determined that the partnership was not entitled to an interest deduction and therefore completely disallowed the loss claimed by petitioner. In addition, the partnership net income for 1974 was determined to be $ 257, of which 57 percent, or $ 168, was added to petitioner's income for such taxable year. Travel and Entertainment Expenses
During the taxable year 1972, petitioner met with various Adams County officials, many of whom were personal and social friends of petitioner, including Glen Lancaster (Lancaster), who was a member of the Board of County Commissioners, with respect to property located in Adams County. The topic of discussion at these meetings [14] included the rezoning of the Custy and Fowler-Fritzler properties, what action could *704 be taken politically to prevent the annexation of property located in Adams County by the City of Denver, and the consequences of the potential relocation of railroad yards by Denver to Adams County. Many of these meetings took place in restaurants over breakfast, lunch or dinner, the cost of which was paid by petitioner. Petitioner maintained a record of these expenditures by way of entry into one of five pocket-size calendars (diaries). The entries into these diaries included the name of the person(s) with whom petitioner met and the cost incurred, both of which were entered upon the date of the meal. [15] *705 Petitioner made the entries into the diary within a short period following these meetings. In addition to these meetings, petitioner incurred expenses when he and Lancaster traveled to Phoenix, Ariz., in February 1972 to look into potential investments together. Petitioner entered the trip into one of his diaries on the dates traveled as "Phoenix, Lancaster" but did not list the cost of such travel. Petitioner did not retain the receipts, check stubs or other evidence of the cost incurred for the meals or travel indicated in the diaries. For the taxable year 1972 petitioner deducted $ 8,558 as travel and entertainment expenses. In his statutory notice of deficiency, respondent disallowed deduction of $ 4,602 of these expenses. [16]
Bad Debt and Fraud
During the taxable year 1972, petitioner met with Lancaster on numerous occasions to discuss political issues concerning Adams County, as well as the possibility *706 of rezoning certain properties in which petitioner had an interest, including the Custy and Fowler-Fritzler properties. These meetings often occurred over meals, the cost of which was paid by petitioner (see travel and entertainment expense issue, supra). Petitioner had been acquainted with Lancaster for approximately 10 years, having first met him when running in the election for County Surveyor in 1962. Lancaster was the Republican Party Chairman for Adams County at the time petitioner ran for the General Assembly in 1968. Their respective families were friends. Prior to making his application to rezone the northern portion of the Custy property, petitioner had met with Lancaster to get his opinion on such rezoning. Lancaster was in favor of having the entire Custy property developed so as to block annexation of the property by Denver. Moreover, since petitioner was the State Representative for Adams County, the Board of County Commissioners trusted petitioner not to allow the property to be annexed by Denver. Lancaster lost in his bid for reelection to the Board in November 1972. However, he remained on the job until January 8, 1973, which was the same day that the Board *707 took action with respect to the rezoning of the Fowler-Fritzler property. Lancaster abstained from voting on the rezoning to avoid a possible conflict of interest, since he and petitioner had discussed the possibility of forming a joint venture with respect to this property. By the fall of 1972, petitioner was anxious to get "something rolling" on the development of the Fowler-Fritzler property, and thought Lancaster would be a good partner, since, by virtue of his prior position on the Board of County Commissioners, he knew a lot of "money people." He and Lancaster had also discussed the possibility of engaging in business in Phoenix, Ariz. [17]
After looking into possible investments in motels, miniwarehouses and retail liquor stores, petitioner and Lancaster decided to start a restaurant since Lancaster had a great deal of restaurant experience. On April 6, 1973, petitioner gave Lancaster a *708 check in the amount of $ 7,500 (advance No. 2), payable to "Glen Lancaster." The money was to be used to acquire an option on a restaurant located in Bennett, Colo.[18]
Petitioner advanced Lancaster an additional $ 5,000 by check, payable to "Glen Lancaster" on May 15, 1973 (advance No. 3). These funds, along with the remaining unused portion of advance No. 2, were to be used to remodel and buy equipment for the restaurant. At this time, petitioner intended the advance to be an equity investment in the restaurant venture. When petitioner and Lancaster decided to start a restaurant, petitioner was adamant that it have a bar, believing it would be more profitable. Without a bar, petitioner did not want to be involved in a restaurant. After making advance No. 3, petitioner was told by various Adams County officials that the restaurant would not be granted a liquor license. [19] As a result, petitioner lost interest in the restaurant because in his view it would be nothing more than a "ma and pa pizza restaurant." Petitioner had also become disenchanted with Lancaster because *709 he had learned that a certain amount of the funds advanced had been used for personal living expenses. Thereafter, he notified Lancaster that he wanted out of the restaurant venture. Subsequently, on July 8, 1973, Lancaster approached petitioner for an additional advance of $ 2,000 needed to purchase equipment for the restaurant and for making lease payments for the property whereon the restaurant was located. Petitioner agreed to make this advance, but also told Lancaster he wanted to be repaid all the money he had previously put into the restaurant, as well as the $ 2,000 he then advanced (advance No. 4). The check was made payable to "Glen Lancaster" and indicated this amount was advanced as a "loan." They discussed the method of repayment of these advancements and it was understood that Lancaster would obtain the funds from the Peoples Bank of Aurora, after the restaurant had been completed and commenced operation. No promissory note or security agreement was ever executed as to these advancements. On *710 July 26, 1973, petitioner advanced Lancaster an additional $ 10,000 by check (advance No. 5) to help him complete the restaurant. This check was also made payable to "Glen Lancaster" and indicated this amount was advanced as a "loan." At that time, Lancaster presented petitioner with an itemized list of what the funds were needed for. The restaurant was thereafter completed in the fall of 1973 and was known as "Margie's Pizza Parlor." After the restaurant had been completed, petitioner questioned Lancaster as to how to resolve repayment of the advances made. At that time the restaurant was not doing well and the Lancaster family was putting in long hours attempting to make it successful. Consequently, petitioner's request for repayment of what had originally been capital contributions angered Lancaster. Later, on the same day as this discussion, petitioner Gloria Newman (Gloria) engaged in a heated telephone conversation with Lancaster over the repayment of the advances made by petitioner. Thereafter, petitioner's and Lancaster's relationship disintegrated to a point where they were no longer on speaking terms. Petitioner did not see Lancaster again until some years later. By *711 the late fall of 1973, Lancaster had begun to drink heavily and the restaurant was being run by his son, Dick, who was killed in an auto accident in February 1974. At the time the advancements had been made, a wrongful death action in the amount of $ 175,000, which had been instituted against Lancaster in 1972, was still pending. [20] The lawsuit was eventually dropped in October or November of 1973. After 1973, petitioner made no attempt to collect the advancements and they have never been repaid.At no time during 1973 did petitioner send Lancaster a demand letter, institute a lawsuit or otherwise take any legal or other action in regard to collection of these advancements. Petitioner filed a financial statement in September 1973, but in the column provided for listing "assets" did not list advance No.'s 1 through 5, totaling $ 26,500, as a receivable. Petitioner stated that since his total net worth, as shown on the statement, was $ 2,325,692 *712 he did not feel that the advancements were a material item. He also did not list his 25 percent interest in the Seattle, Wash., apartment house. Lancaster filed a financial statement on August 27, 1973, but did not list advance No.'s 1 through 5 as liabilities. He stated he did not do so because he was not sure whether they were loans or capital contributions, and because they were unsecured. Petitioner deducted the total advances, $ 26,500, as a nonbusiness bad debt for the taxable year 1973. When having his tax return prepared for such year in April 1974, petitioner told his accountant that he considered these advances to be uncollectible. Petitioner did not, however, insist on any particular tax treatment with respect to such advancements, and it was his accountant who determined that the $ 26,500 could be taken as a nonbusiness bad debt.[21]
Respondent disallowed this deduction *713 in its entirety. OPINION The first issue is whether for each of the taxable years in issue, the gain recognized from the sole of an interest [22] in three parcels of land was reportable as capital gain or ordinary income. Assuming capital gain treatment prevails, an ancillary issue is whether the Choate property was held longer than six months, thereby entitling petitioner to recognize the gain as long-term capital gain. Petitioner maintains that he did not hold his interest in the Custy, Choate or Fowler-Fritzler properties primarily for sale to customers in the ordinary course of a trade or business, but rather, for purposes of investment. In support of this assertion he points to the fact that he engaged in only three sales of *714 property, that these properties were sold in bulk, that they were not subdivided, improved or developed by him, and that he engaged in minimal sales activity. With respect to his holding of the Choate property, petitioner maintains the contract to purchase such property was acquired May 1, 1972, and disposed of November 8, 1972, and that the required six-month holding period had been met. Respondent argues that the Custy, Choate and Fowler-Fritzler properties were held primarily for sale to customers in the ordinary course of petitioner's business. He maintains that petitioner used his expertise as a politician and civil engineer to acquire, package and sell these properties and that he was in the trade or business of doing so. Alternatively, respondent argues that if capital gain treatment applies the Choate property was held not longer than six months and therefore income received from the sale thereof is short-term capital gain. Petitioner is entitled to capital gains treatment on the income derived from his property sales only if such properties were "capital assets." See sec. 1222. Generally speaking, section 1221 defines a capital asset as any property held by a taxpayer. *715 This definition is subject to certain exceptions, including, interalia, "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Sec. 1221(1). The purpose of this exception is to "differentiate between gain derived from the everyday operation of a business and gain derived from assets that have appreciated in value over a substantial period of time." McManus v. Commissioner,65 T.C. 197, 212 (1976), affd. 583 F.2d 483 (9th Cir. 1978).Further, the word "primarily," as used in section 1221(1) means "of first importance" or "principally." Mallat v. Riddell,383 U.S. 569 (1966). Whether property is excluded from capital asset status by virtue of section 1221(1) is a question of fact, the burden of proof of which is on petitioner. Rule 142(a); [23]Tri-S Corporation v. Commissioner, 400 F.2d 862, 864 (10th Cir. 1968), affg. 48 T.C. 316 (1967). Certain factors have been enunciated by this and other courts as helpful guides in reaching a correct resolution of the issue. These factors include: the nature and purpose of the acquisition *716 of the property and the duration of the ownership; the extent and nature of the taxpayer's efforts to sell the property; the number, extent, continuity, and substantiality of sales; the extent of subdividing, developing and advertising to increase sales; the use of a business office for the sale of the property; the character and degree of supervision of control exercised by the taxpayer over the representative selling the property; and the time and effort the taxpayer habitually devoted to the sale. Buono v. Commissioner,74 T.C. 187, 199 (1980); United States v. Winthrop,417 F.2d 905 (5th Cir. 1969). Respondent asserts that each of these sales was pursuant to an overall scheme whereby petitioner would acquire property which was "ripe" for development, perform the engineering work needed in preparing development plans, obtain the necessary rezoning for such properties, and finally, sell such properties to a waiting developer, all the result of the extension of his occupations as a politician and an engineer. Therefore, he claims that each of these properties was held primarily for sale in the ordinary course of petitioner's trade or business. We disagree.
Here, prior to acquisition *717 of the Custy property, petitioner had never purchased or sold an interest in real estate other than his personal residence. Other than the sale of the Custy and Choate properties in 1972 and the Fowler-Fritzler property in 1973, petitioner sold no properties during the taxable years in issue. Petitioner did not develop, subdivide or improve in any way any of these properties, nor had he ever subdivided any real estate that he owned. In fact, the only activity of any sort engaged in with respect to these properties was the application and approval for rezoning with respect to the Custy and Fowler-Fritzler properties. Even assuming petitioner specifically sought and gained rezoning approval for the purpose of making such properties more marketable for sale inbulk, which we do not believe he did, such conduct alone does not rise to the level of a trade or business, especially in view of the overall lack of number, continuity, and substantiality of the sales. See Buono v. Commissioner,supra; see McManus v. Commissioner,supra.[24] *718 Additionally, petitioner engaged in no sales activities with respect to the sale of any of these properties. He did not advertise the properties for sale, did not have a real estate agent or broker's license, did not have a real estate agent or broker to market the properties, and did not maintain a business office for the purpose of negotiating sales. Cf. Winthrop v. United States,supra; Mauldin v. Commissioner,195 F.2d 714 (10th Cir. 1952), affg. 16 T.C. 698 (1951). Furthermore, during the taxable year 1972 when two of the three sales occurred, petitioner was a State representative, a member of the civil engineering firm of Engineering Services, an independent engineering consultant, and involved in various other business ventures. In short, petitioner devoted little of his time and effort to the sale of the properties. Buono v. Commissioner,supra.
It is true that petitioner reaped substantial profit from the sale of these properties after having held them for a relatively short period of time. Assuming with respect to the Fowler-Fritzler *719 and Custy properties, that this profit was a direct result of such properties being rezoned, an assertion for which there was no direct evidence, and therefore a direct result of efforts by petitioner, we would still not find petitioner sold these properties "in the ordinary course of his trade or business." In Buono v. Commissioner,supra at 205, n. 25, we held that "The fact that a substantial amount of appreciation is due to the taxpayer's activities is, of course, a significant factor to consider in making this determination. However, such does not, standing alone, necessarily require a finding that the taxpayer's property is excluded from the capital asset definition by sec. 1221(1)." See also United States v. Winthrop,supra.
There is no evidence that petitioner's real estate activities were a part of his occupation of being a politician, if such was his occupation, nor of his engineering business, as argued by respondent. Based on the evidence presented and the record as a whole we find that petitioner did not hold his interests in either the Custy, the Fowler-Fritzler or the Choate property primarily for sale to customers in the ordinary course of a trade or business within *720 the meaning of section 1221(1). We therefore hold that the gain from the sale of his interests in those properties was properly reported as long-term capital gain. Having determined that the sales of the properties resulted in capital gains, we now must decide whether the gain from the sale of the contract to purchase the Choate property is to be treated as long-term or short-term capital gain. Pursuant to section 1222(3), property must be held longer than 6 months before "long-term" capital gain treatment attaches. Here, there is no dispute that petitioner disposed of the contract to purchase this property on November 8, 1972. Petitioner maintains that he acquired such contract on May 1, 1972, or 6 months and 7 days prior to sale, and is therefore entitled to long-term capital gains treatment on the sale of such property. Respondent asserts that this contract was acquired no sooner than May 10, 1972, or 2 days short of 6 months prior to sale, and is therefore entitled to only short-term capital gains treatment. The burden of proof with respect to this issue is on petitioner. Rule 142(a); Reily v. Commissioner,53 T.C. 8, 13 (1969). In support of his argument, petitioner points *721 out that the "Specific Performance Contract" for the purchase of the Choate property was dated May 1, 1972. Additionally, he asserts that because the purchase price was in excess of the property's appraised value the Court's approval of "Order for Sale of Real Estate" filed May 10, 1972, could be presumed and was not a controlling factor in the contract's execution. Finally, he claims that he was well aware that to be entitled to long-term capital gains treatment he must hold the property longer than 6 months, as evidenced by the fact that the Custy property was sold 6 months and 1 day after acqusition. However, based on all the evidence presented, we find that petitioner has not met his burden of proof on this issue, and hold for respondent. When petitioner signed the "Specific Performance Contract" on May 1, 1972, he did nothing more than make an offer to purchase the Choate property, which he was assured would be accepted by the seller. Indeed, the document itself stated that "Upon approval hereof by the seller, the agreement shall become a contract." Clearly, when Berger, the attorney for the estate, brought petitioner the document on May 1, 1972, for his signature, he was *722 merely soliciting an offer, which he believed the estate would accept. Petitioner's own testimony that Berger had told him the estate would "go along with * * * this offer" (then being made by petitioner) if he would agree to the $ 85,000 purchase price, buttresses our finding. The offer made by petitioner was in fact accepted. However, the only evidence as to the date of such acceptance indicates it was subsequent to May 10, 1972. There is no date following the administratrix's signature to indicate when she signed the contract. Berger stated he would not have advised the administratrix of the estate to sign the document until after all negotiations for the sale of the property had been completed, and that after signing, he would not have solicited additional offers. Yet, on May 10, 1972, Berger informed Aurora that its previous offer to purchase the property was being rejected and if it wished to make an additional offer, it must do so by May 12, 1972. Furthermore, the order for sale was not entered until May 10, 1972, and the sale was not approved by the probate court until June 10, 1972, and the efficacy of the contract prior to that time is doubtful. Having concluded that *723 petitioner did not meet his burden of proof, we find that he did not hold the contract for purchase of the Choate property until sometime subsequent to May 10, 1972. Therefore, we hold that gain recognized on the sale of such contract is to be treated as short-term capital gain. See sec. 1222(1). Payments to Sam Ingram
The next issue for decision is whether for the taxable years 1972 and 1973, petitioner is entitled to deduct payments made to Ingram, in part as interest under section 163(a) and in part as a loss incurred in a transaction entered into for profit under section 165(c)(2). [25]
First, as to amounts claimed to be deductible as interest, petitioner maintains that the $ 20,000 advance from Ingram created a bona fide debt and payments in respect of such debt were properly deducted as interest.We agree.
Section *724 163(a) provides a deduction for all interest paid or accrued within the taxable year on indebtedness. An indebtedness pursuant to section 163(a) "means an existing, unconditional, and legally enforceable obligation for the repayment of money." Kovtun v. Commissioner,54 T.C. 331, 338 (1970). Whether the $ 20,000 advance created a bona fide debt is a question of fact, the burden of proof of which is on petitioner. Rule 142(a); see McSorley's, Inc. v. United States,323 F.2d 900, 901-902 (10th Cir. 1963). Here, Ingram advanced the $ 20,000 to petitioner for the purpose of investing in the Fowler-Fritzler property. It was specificly determined, however, that he would only receive an equity interest in the property if and when enough investor interest in such property had been generated so as to justify its development. That interest was not generated and petitioner subsequently returned the advance (plus $ 5,000; see sec. 165(c)(2) discussion, infra) to Ingram. The facts clearly establish an understanding between petitioner and Ingram that the advance was to be regarded as a loan until such investment came into fruition. Although a note evidencing the indebtedness did not exist, *725 it is clear that a bona fide debt did exist. See McSorley's Inc. v. United States,supra.
Petitioner had the use of the $ 20,000 for approximately 1 year, from June 1972 to June 1973. He paid Ingram $ 984 each year, which is the amount Ingram had requested. Thus, the rate of interest charged was approximately 10 percent per annum. The U.S. Supreme Court has defined "interest * * * on indebtedness" as "compensation for the use or forbearance of money." Deputy v. DuPont,308 U.S. 488, 498 (1940). We believe that when petitioner paid Ingram $ 984 in 1972 and $ 984 in 1973, he was paying him for the "use or forbearance" of Ingram's money. Therefore, we hold that petitioner properly deducted $ 984 as interest for the taxable years 1972 and 1973. Second, with regard to the $ 5,000 claimed deductible under section 165(c)(2), petitioner asserts that this amount was paid to forestall Ingram's father-in-law from claiming that Ingram had acquired an equity interest in the Fowler-Fritzler property. He maintains that this payment arose out of his dealing with Ingram in which he had an expectation of financial gain. Respondent maintains that since petitioner first raised this theory or issue *726 on brief it is not properly before the Court, but even if it is petitioner has not met his burden of proof with respect to this issue. We agree with respondent on both counts.
The $ 5,000 was claimed as an interest deduction on petitioner's return, in his petitioner, and was so considered at the trial. While petitioner may have introduced whatever evidence he had at the trial to prove that the payment was allowable as a loss under section 165(c)(2), respondent was not aware that the evidence was being offered for that purpose and hence had no reason to offer any rebuttal evidence that might have been available. Section 165(a) allows as a deduction any loss sustained during the taxable years and not compensated for by insurance or otherwise. In the case of individuals, however, the deduction is limited to certain types of losses by section 165(c). Specifically, section 165(c)(2) permits a deduction for "losses incurred in any transaction entered into for profit, though not connected with a trade or business." Thus there must be a loss and that loss must be incurred in a transaction entered into for profit. It is easy to recognize that the proof of "interest" and the proof of such *727 a "loss," and evidence in contradiction of the two items, could be quite different. If we were to find that the evidence presented by petitioner proved that petitioner was entitled to a deduction for a loss on a transaction entered into for profit, respondent would be prejudiced and we would have to give him an opportunity to offer evidence in rebuttal thereof. This method of getting an issue before the Court is not acceptable under the Court's Rules of Practice and Procedure. See Rule 31. See also Fox Chevrolet, Inc. v. Commissioner,76 T.C. 708, 733-736 (1981); Estate of Horvath v. Commissioner,59 T.C. 551, 554-556 (1973). But even if this theory was properly before the Court, we would find that petitioner has not carried his burden of proof. If the transaction entered into is determined to be the loan from Ingram, petitioner has simply borrowed money which gives rise to a debt, not a profit, and thus is not a transaction entered into for profit. Or if the transaction involved is viewed as being petitioner's overall investment in the Fowler-Fritzler property, the extra $ 5,000 paid could not be treated as a "loss" since the property was sold for a gain of over $ 640,000. In *728 our opinion, based on what little evidence we have on this subject, the extra $ 5,000 payment was nothing more than a voluntary payment to forestall future claims by or on behalf of Ingram for an interest in the Fowler-Fritzler property. This does not entitle petitioner to a deduction under section 165(c)(2). Partnership Loss
The next issue is whether for the taxable year 1974, the Newmark partnership, of which petitioner was a 57 percent partner, suffered a loss, thereby entitling petitioner to deduct his share of such loss. Resolution of this issue depends on whether, for the taxable year 1974, Newmark is entitled to a deduction of $ 22,799.51 as interest pursuant to section 163(a). Petitioner asserts that of the $ 26,057 paid by Newmark with respect to the outstanding loan, $ 22,799.51 of such amount was properly deducted as interest even though it was applied to reduce the principal balance of the loan. Specifically, he argues that modification of the 1972 note created a new note, and that actual payment on the new note should first be applied to the accrued interest on the old note, despite the agreement of the lender and Newmark (parties) that the "interest" otherwise payable *729 during 1974 should be added to the principal balance of the new note. Respondent asserts that only principal was actually paid by Newmark with respect to the 1972 note during 1974, and the addition of interest to the unpaid principal balance cannot be considered the "payment" of interest. The general rule relating to the treatment of voluntary partial payments on an indebtedness is that such payments are generally treated as first applying to interest and then to reduce principal. Motel Corp. v. Commissioner,54 T.C. 1433 (1970); Estate of Paul M. Bowen v. Commissioner,2 T.C. 1 (1943). [26] This rule does not apply, however, when from the circumstances it may reasonably be inferred that the parties understood and intended that a different allocation of the payments would be made. Groves v. Commissioner,38 B.T.A. 727 (1938). Under such circumstances the allocation between principal and interest agreed upon by the parties will be given effect. Bayou Verret Land Co. v. Commissioner,52 T.C. 971, 983-984 (1969), revd. and remanded on other grounds 450 F.2d 850 (5th cir. 1971). Here the note evidencing the indebtedness called for the *730 payment of $ 22,799.51 as interest and $ 3,257.49 on principal during 1974. It is stipulated that at some time during 1974 the parties reached an agreement altering the terms of the note so that the entire payment for the taxable year 1974 ($ 26,057) was to be applied against the principal balance of the loan and the interest that otherwise would have been paid ($ 22,799.51) was to be added to the principal balance to be paid in future years. The net effect was that Newmark paid a total of $ 26,057 and the principal balance of the note was reduced by a net amount of $ 3,257.49 [27] *731 (reduced first by $ 26,057 and then increased by $ 22,799.51). Petitioner has in essence relied on the general rule that absent an agreement otherwise, payments on a loan are applied first to reduce interest, and then principal. On brief he asserted that Rev. Rul. 70-647, 1970-2 C.B. 38, is supportive of his argument.The facts of that ruling indicated that the lender *732 required principal on its loans to be repaid prior to the payment of interest. However, remaining principal plus accrued interest on an initial loan were combined with an additional loan into a new note with interest thereon. Absent a specific agreement as to the application of payments thereafter to the remaining principal and accrued interest on the initial loan, the ruling held that the general rule that payments be applied to interest first controlled. Therefore, the ruling found that irrespective of the lender's requirement that principal on the new note be paid first, payments on such note were applied first to interest, to the extent of that accrued on the initial loan.Thereafter, pursuant to the lender's requirement, payments were of principal, with the interest on the new note being paid subsequent to such principal. The ruling has essentially enunciated the general rule with respect to the character of payments on a loan, Motel Corp. v. Commissioner,supra, and the exception thereto. Groves v. Commissioner,supra. Even assuming that modification of the 1972 note created a "new note," as petitioner contends, unlike the factual situation presented in the ruling, repayment *733 of such note specifically required that, at least for 1974, all payments would be applied to reduce principal. The parties clearly understood and desired that the payments would be so applied. Based on the facts presented herein, we conclude that all payments by Newman during 1974 in respect of the loan constituted "principal" for tax purposes. Huntington-Redondo Co. v. Commissioner,36 B.T.A. 116 (1937). See also Rev. Rul 63-57, 1963-1 C.B. 103; Nowhouse v. Commissioner, 59 T.C, 783 (1973). Respondent's determination of deficiency is therefore sustained. Travel and Entertainment Expenses
The next issue for decision is whether for the taxable year 1972, petitioner is entitled to a deduction under section 212 [28] *734 for additional travel and entertainment expenses incurred in connection with the Fowler-Fritzler and Custy properties, as well as various other "possible investments." Petitioner has asserted that the expenditures claimed were incurred in connection with the then potential development of the Fowler-Fritzler and Custy properties and that such expenses are deductible under either section 212(1) or (2). [29] Further, he asserts that these expenditures, which consisted mostly of expenditures for meals and drinks, were substantiated in compliance with section 274(d). Respondent asserts that petitioner has failed to meet the substantiation requirements *735 of section 274(d) with respect to the claimed expenditures and such expenditures are therefore not deductible. For the reasons stated herein, we agree with respondent. Section 274(d) and the regulations thereunder provide that no deduction is allowable to a taxpayer for travel and entertainment expenses unless such exenses are substantiated by "adequate records or by sufficient evidence corroborating his own statement." The elements of each expense which must be substantiated include the amount, time, place, business purpose of such expense, and the business relationship of the person entertained. Sec. 1.274-5(b)(2) and (3), Income Tax Regs.
In order to comply with the "adequate records" requirement, each of the above elements must be made clear in an "account book, dirary, statement of expense or similar record" which was prepared or maintained contemporaneously to the expenditure. Sec. 1.274-5(c)(2)(i) and (ii), Income Tax Regs. Furthermore, all expenditures for lodging while traveling away from home and any other expenditure of $ 25 or more, must be supported by documentary evidence, such as receipts or check stubs, together with a bill from the payee. [30]Sec. 1.274-5(c)(2)(iii), Income Tax Regs. *736 To substantiate the meal (entertainment) expenses, petitioner has attempted to comply with the "adequate records" test. The "diaries" submitted into evidence, however, nowhere disclose the "place," i.e., the restaurant, in which such expenses were incurred. Furthermore, the diaries fail to establish the business purpose of the expenditure and petitioner's business relationship to the person entertained. Although sec. 1.274-5(c)(2)(ii)(b), Income Tax Regs, provides that a written statement of the business purpose is not required, where such purpose is evident from the surrounding facts and circumstances, this exception is not available herein. Petitioner met with various Adams County officials for any one of three reasons: To socialize with friends, to discuss political issues relevant to Adams County, and to discuss the rezoning of properties owned by petitioner. The diaries did not indicate the purpose for any of the meetings, nor did they indicate the business relationship of the person entertained, and therefore this exception to the business purpose requirement is unavailable since we *737 are unable to deduce the business purpose of the expenditure claimed from the surrounding facts and circumstances. See Rutz v. Commissioner,66 T.C. 879 (1976), n. 4 at 883. Accordingly, we hold that petitioner has not substantiated his expenses by the "adequate records" requirement of section 274(d). In order to satisfy the substantiation requirement by "sufficient evidence corroborating his own statement," petitioner must establish each of the above elements by his own written or oral statement containing specific information in detail as to each element. Sec. 1.274-5(c)(3)(i) and (ii), Income Tax Regs. Moreover, each element must be established by other corroborative evidence, which, with respect to the cost, time, place, or date of the expenditure, must be in the way of direct evidence such as written or oral testimony by the person entertained. Sec. 1.274-5(c)(3), Income Tax Regs.
Petitioner testified to the effect that all the expenses claimed were incurred were incurred in connection with development of the Fowler-Fritzler and Custy properties and with his other "various businesses." He also entered into evidence a statement which summarized the date, name, and title of *738 the person entertained, and the amount expended. However, he presented no evidence as to the place of the expenditure. Additionally, his general, self-serving testimony as to the purpose of the expenditure does not provide the "specific information in detail" to substantiate the business purpose. See Rutz v. Commissioner,supra.Finally, in no case did he present any evidence to corroborate his statements as to these elements. In conclusion, we hold that petitioner has failed to substantiate his claimed travel and entertainment expenses as required by section 274(d). Respondent's determination is therefore sustained. Bad Debt Deduction
The next issue for decision is whether for either the taxable year 1973 or 1974, [31] petitioner is entitled to a bad debt deduction pursuant to section 166(d) for advances made to Lancaster during 1973. Petitioner maintains that *739 the advances made to Lancaster during 1973 created a bona fide debt and that the debt had become wholly worthless by the end of 1973. Specifically, he asserts the advances had been converted to "debt" after he was informed that a liquor license for the restaurant could not be obtained and he notified Lancaster he no longer wished to be involved with such restaurant. Petitioner claims that this debt had become worthless by the end of 1973 based on the following assertions: That the Newman and Lancaster family friendship had ended; that the restaurant was not doing well; that Lancaster had developed a drinking problem; that a wrongful death action instituted against Lancaster in 1972 in the amount of $ 175,000 had resulted in a judgment against him and that Lancaster's son, Dick, who had been running the restaurant, was killed in an accident in February 1974. Alternatively, he asserts that the "debt" had become worthless by the end of 1974, based on the same facts. Respondent maintains that no bona fide debt existed, and even assuming, arguendo, that it did, the debt had not become worthless by either the end of 1973 or 1974. Specifically, he asserts that the advances to Lancaster *740 were in the nature of compensation for "favors" performed by Lancaster while he was on the Board of County Commissioner, with respect to the rezoning of property interests owned by petitioner during that time. Alternatively, he asserts that even if the advances created a bona fide debt, petitioner has not shown that such debt had become worhtless by either the end of 1973 or 1974. Section 166(d) provides a deduction for noncorporate taxpayers of nonbusiness debts which have become worthless within the taxable year. Before a deduction under the section is allowed, it is essential that the existence of a valid debt be found. Cullinan v. Commissioner,19 B.T.A. 930 (1930). A "debt," for purposes of section 166 means a "valid and enforceable obligation to repay a fixed and determinable sum of money." Sec. 1.166-1(c), Income Tax Regs.SeeHardy v. Commissioner,54 T.C. 1194 (1970). Furthermore, what was originally equity may become debt and vice versa. See Tampa & Gulf Coast Railroad Co. v. Commissioner,56 T.C. 1393, 1402 (1971); Cuyana Realty Co. v. United States,180 Ct. Cl. 879, 382 F.2d 298, 301 (1967). Neither on the making of advance No. 1, which was unrelated to the restaurant, *741 nor advance Nos. 2 and 3, which were made in connection with the restaurant, do we find that a "debt" was initially created. Advance No. 1 was made to cover expenses incurred by Lancaster on a trip to Phoenix, Ariz., made for the purpose of seeking out potential investments for him and petitioner. It is most unlikely that Lancaster would agree or petitioner expect that Lancaster bear the entire financial burden of such a trip, especially in view of his then recent unemployed status. Advance Nos. 2 and 3 were specifically made as equity investments in the restaurant. Advance Nos. 4 and 5 were made after petitioner decided he no longer wished to be involved with Lancaster in the restaurant business. These advances were specifically designated as "loans" and were made only after Lancaster had agreed to repay all amounts previously advanced by petitioner with respect to the restaurant. Based on the evidence presented, we conclude that advance No. 1 was not a "debt" within the meaning of section 166, since, in our opinion, there was no enforceable obligation to repay. However, as to advance Nos. 2 and 3, we find that irrespective of their original character, by the end of 1973, these *742 advances represented debts which were owed to petitioner. By that time, petitioner had told Lancaster he wanted out of the restaurant business, and that he wanted all the funds previously advanced to be repaid. Moreover, as we have noted above, advances No. 4 and 5 were specifically made only after Lancaster had agreed to repay these funds. With regard to advances No. 4 and 5, such advancements were never understood to create anything other than an obligation to repay, and were clearly debts owed to petitioner. Whether the debt owed petitioner (advances No. 2 through 5) had become worthless is yet another question. After a careful review of all the evidence presented we find that such debt had not become worthless by either the end of 1973 or 1974. Worthlessnes of a debt is determined by an objective standard which is met by a showing of identifiable events which form the basis of reasonable grounds for abandoning any hope of future recovery. Dallmeyer v. Commissioner,14 T.C. 1282, 1291 (1950). The subjective good faith opinion of petitioner alone is insufficient. Fox v. Commissioner,50 T.C. 813 (1968), affd. per curiam (9th Cir. 1970). Whether a debt has become worthless *743 is a question of fact, the answer to which lies in an examination of all the circumstances. Riss v. Commissioner,56 T.C. 388, 407 (1971). The burden of proof with respect to this issue is on petitioners. Perry v. Commissioner,22 T.C. 968 (1954); Rule 142(a). Entitlement to a bad debt deduction for the taxable year 1973 requires that petitioner demonstrate that the debt in issue had some value at the time created, and that it had become worthless by the end of the taxable year 1973. In this regard, "worthless" means lack of potential value as well as any current liquid value. Dustin v. Commissioner,53 T.C. 491, (501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). Here, although petitioner may have correctly believed he would not be repaid the advances in the near future, it could not be determined objectively that he would never collect any of such advances. The only facts occuring during 1973 on which petitioner relied was Lancaster's drinking problem, and the breakup of his and Lancaster's personal friendship and the fact that the restaurant was not doing well. The wrongful death suit against Lancaster was dropped in October or November of 1973 and Lancaster's son, Dick, who *744 had been running the restaurant, was not killed until February 1974. The totality of the factors occurring in 1973 would not, in our view, form the basis of reasonable grounds for abandoning any hope of future recover. Dallmeyer v. Commissioner,supra. Therefore, petitioner has not met his burden of proof with respect to the worthlessness of the debts by the end of 1973. Furthermore, the death of Lancaster's son, Dick, in February of 1974, when combined with the above facts, equally fails to establish worthlessness. So far as we know, Lancaster was still in the restaurant business at the end of 1974. It is noteworthy that other than a discussion as to the repayment of such advances, which occurred in September 1973, petitioner never attempted to collect any of the amounts owed him. It is axiomatic that a taxpayer must exhaust all the usual and reasonable means of collecting a debt before worthlessness can be determined. [32] *745 See Spratt v. Commissioner,43 B.T.A. 503, 513 (1941).Having determined that the debt was not worthless in either 1973 or 1974, we hold for respondent. Fraud
The last issue is whether for the taxalbe year 1973 petitioner is liable for an addition to tax imposed under section 6653(b) for fraud. Fraud, within the meaning of section 6653(b), has been defined to mean "actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Mere negligence does not establish either." Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941) revg. 40 B.T.A. 424 (1939). Respondent has the burden of proving this issue by clear and convincing evidence. Green v. Commissioner,66 T.C. 538, 549 (1976); Rule 142(b). Respondent relies on the alleged erroneous claim of a bad debt deduction for the $ 26,500 advanced to Lancaster as the basis for an addition to tax for fraud in the amount of $ 45,295 for the year 1973. Respondent maintains that the advances were compensation to Lancaster for past favors and did not create debts; alternatively, that even if such advances constituted debts, petitioner knew that they were not worhtless as of the end of 1973 and was fraudulent in claiming them as bad debt deductions. *746 We conclude that respondent has failed to carry his burden of proof on this issue and are somewhat dubious of the justification for asserting the addition to tax for fraud on this ground alone. Respondent offered no evidence to prove that these advances were "payoffs" from petitioner to Lancaster other than his own conjecture that because petitioner made rather large profits on the resale of the Custy and Fowler-Fritzler properties after they had been rezoned while Lancaster was on the Board, petitioner felt obligated to Lancaster. On the other hand, petitioner offered specific evidence explaining the purpose of each of the five advancements to Lancaster and we have found, based on that evidence, that four of the five advances created debts from Lancaster to petitioner. The fifth advance was to cover expenses of a trip Lancaster took for the business interests of both himself and petitioner, which petitioner, in good faith, might have considered to be refundable. The evidence does not support petitioner's claims that these debts became worthless by the end of 1973 or 1974. However, the determination of worthlessness is a matter of judgment based on numerous facts and circumstances *747 and there were circumstances which could have justified petitioner's belief that the debts were worthless by the end of 1973. Petitioner's mistaken belief that Lancaster would not be able to obtain a liquor license and that a wrongful death judgment had been entered against Lancaster, coupled with Lancaster's excessive drinking and his son, Dick's, death in February of 1974, prior to the filing of petitioner's 1973 return, probably impacted on petitioner's conclusion that the debts were worthless by the end of 1973.Under the circumstances we do not believe that petitioner's claim of worhtlessness was de with fraudulent intent. He told his accountant of the circumstances and relied on his accountant for the proper treatment of the debts, and did not demand that it receive a particular treatment. See Marinzulich v. Commissioner,31 T.C. 487 (1968). Based on all the evidence presented and the record as a whole, we find that respondent has not met his burden of proof, and hold that petitioner did not fraudulently underpay any tax required to be shown on his return for the taxable year 1973. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. Aurora is located within Adams County, Colo.↩
3. As a State Representative, petitioner was paid a salary of $ 7,810 per year. Engineering Services paid him $ 10,000 per year.↩
4. The record is not clear on the option price. Petitioner paid $ 10,000 for the option which was to be applied on the purchase price. The purchase price was stated to be $ 962,500, to be amended to equal $ 2,500 per acre for the total acreage shown by a survey. The parties seem to be in agreement that the final purchase price for the entire Custy property was $ 1,200,000.↩
6. This property is contiguous with the northern portion of the Custy property.↩
7. Berger was also Attorney of Adams County. ↩
8. The Choate property bordered Aurora's gravel pit.↩
9. Paragraph 10 of the document, located immediately above the space whereon petitioner's signature appears, provides that "upon approval hereof by the seller, this agreement shall become a contract between seller and purchaser and shall inure to the benefit of the heirs, successors and assigns of said parties."↩
10. Aurora had been negotiating with Berger for the purchase of the property. On May 10, 1972, Doug McEvoy, purchasing agent for Aurora, was informed by Berger that an offer by Aurora of March 28, 1972, would not be considered, but if Aurora was to make an unconditional offer, a decision would be made by May 12, 1972. Berger stated he would not have advised the signature of his client on the contract until negotiations had been completed, nor would he have solicited additional offers following such completion.
11. There was no written agreement with respect to the $ 20,000 paid to petitioner or the interest paid to Ingram.↩
12. Payment was by check and was payable to both Ingram and the United Bank of Denver. This amount represents the $ 20,000 actually advanced to petitioner, $ 5,000 claimed by the father to have been advanced to petitioner, and $ 984 as interest on the $ 20,000 for 1973.↩
13. On brief petitioner concedes that $ 3,257.49 of such amount was principal and is not deductible.↩
14. Petitioner did not testify specifically as to the nature of each of these meetings, but rather, only stated that for the most part, they related to rezoning for mobile home parks or to other of his "various business in 1972."↩
15. A summary of these diaries was entered into evidence at trial. The summary was prepared in preparation for trial, and listed the date, meal, i.e. breakfast, the person met and the cost incurred at each meeting. Petitioner stated that the information provided by the summary came directly from the diaries. However, certain of the expenditures claimed in the summary could not be found in the diaries. The total expenses claimed, as listed in the summary, was $ 1,675.09, of which $ 674.92 was incurred in increments of less than $ 25.
16. The parties stipulated that only $ 1,558 of the amount originally disallowed remains in dispute.↩
17. On March 9, 1973, petitioner paid Lancaster $ 2,000 by way of check to pay for expenses of a trip made to Phoenix. This check (advance No. 1) was made payable to cash and designated that the funds were for "Expenses." Petitioner was under the impression that these funds were to be repaid.↩
18. The Bennett location was not selected and petitioner and Lancaster ultimately decided on a location in Aurora.↩
19. Lancaster in fact obtained a beer and wine license for the restaurant in the fall of 1973 when it first opened. He applied for an received a mixed drink liquor license in 1974.↩
20. Petitioner was made aware of the wrongful death action at the time he questioned Lancaster as to how to resolve repayment of the advancements. He was later mistakenly informed by friends that a judgment against Lancaster had been entered.↩
21. This treatment was determined on the basis of what petitioner had told his accountant concerning the collectibility of the advancements. The accountant did indicate to petitioner that he should obtain a legal opinion as to the worthlessness of the "debt," and was under the impression he had done so.↩
22. The interest sold with respect to the Custy and Choate properties was not the properties themselves, but rather the specific performance contract to purchase such properties. Such an interest is "property" within the meaning of sec. 1221. See Coraci v. Commissioner,T.C. Memo. 1954-64↩. All references herein to "properties" sold by petitioner include such contracts. Also, references to the sale of the Custy property refer only to the northern portion.
23. All references to "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure.↩
24. See also Binda v. Commissioner,T.C. Memo. 1963-236. The frequency and substantiality of sales has been held to be the most important factor in determining whether the sales of real estate occur in a trade or business. Suburban Realty Co. v. United States,615 F.2d 171, 178↩ (5th Cir. 1980).
25. Petitioner deducted all amounts paid to Ingram during 1972 and 1973 as interest. In his petition and at trial he claimed such amounts were properly deducted as interest pursuant to sec. 163(a). On brief, however, petitioner conceded that a portion ($ 5,000) of these expenses are not deductible under sec. 163(a), but asserts they are deductible under sec. 165(c)(2).↩
26. See Ferenc v. Commissioner,T.C. Memo. 1974-30↩.
27. This issue was presented to the Court on fully stipulated facts. Unfortunately, these facts were incomplete and do not enable us to give full consideration to this issue. From what we can perceive, the only effect of the 1974 modification of the 1972 note was to recharacterize the interest payments for the taxable year 1974 as principal.Among the many factual infirmities, no evidence was presented as to the amount of the original loan, the remaining principal balance of such loan immediately prior to or subsequent to 1974, or the rate of interest charged on such loan. Moreover, we do not know when during 1974 the agreement was reached, whether the modification was to affect all future payments on the original note such that the loan would be interest free, or that principal would be repaid in full before the payment of interest, or the purpose for making such modification. Therefore we specifically do not decide whether and under what circumstances a cash basis taxpayer may, either prospectively or restroactively, recharacterize interest accruing on a loan as "principal" for tax purposes. For our purposes herein, we have proceeded on the basis that the parties modified the note with a clear understanding of its substance and content and petitioner is not now at liberty to challenge that modification (which he has not). See Hamilin's Trust v. Commissioner,209 F.2d 761 (10th Cir. 1954), affg. 19 T.C. 718↩ (1953).
28. Petitioner originally claimed a deduction of $ 8,558 on his Schedule C on which he indicated his principal business activity as "Civil engineer." Respondent disallowed $ 4,602 of this amount. In his petition, petitioner claimed $ 1,559 of the disallowed amount was properly deductible under sec. 162(a) as a business expense in connection with his civil engineering consulting business. At trial, petitioner again asserted that these expenses were deductible pursuant to sec. 162(a). On brief, petitioner for the first time claimed that such expenses were incurred in connection with the Fowler-Fritzler and Custy properties, and are therefore deductible under sec. 212.
29. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; * * *↩
30. See Brinson v. Commissioner,T.C.Memo. 1981-671; Gee v. Commissioner,T.C.Memo. 1977-72↩.
31. On his tax return for 1973, in his petition, and at trial, petitioner maintained the loss occurred in 1973. On brief, petitioner alternatively argued that if the "debt" had not become worthless by Dec. 31, 1973, it was worthless by Dec. 31, 1974, and that he is therefore entitled to a bad debt deduction for such year.↩
32. See Suman v. Commissioner,T.C.Memo. 1967-84. This, of course, does not necessarily require that suit for collection have been instituted against Lancaster. See sec. 1.166-2(b), Income Tax Regs.↩